# FORD *v.* WAINWRIGHT, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS

No. 85–5542.   Argued April 22, 1986—Decided June 26, 1986

MARSHALL, J., announced the judgment of the Court and delivered an opinion of the Court with respect to Parts I and II, in which BRENNAN, BLACKMUN, POWELL, and STEVENS, JJ., joined, and an opinion with respect to Parts III, IV, and V, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 418. O'CONNOR, J., filed an opinion concurring in the result in part and dissenting in part, in which WHITE, J., joined, *post*, p. 427. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 431.

*Richard H. Burr III* argued the cause for petitioner. With him on the briefs were *Richard L. Jorandby, Craig S. Barnard,* and *Laurin A. Wollan, Jr.*

*Joy B. Shearer,* Assistant Attorney General of Florida, argued the cause for respondent. With her on the brief was *Jim Smith,* Attorney General.*

JUSTICE MARSHALL announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II and an opinion with respect to Parts III, IV, and V, in which JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join.

For centuries no jurisdiction has countenanced the execution of the insane, yet this Court has never decided whether the Constitution forbids the practice. Today we keep faith with our common-law heritage in holding that it does.

I

Alvin Bernard Ford was convicted of murder in 1974 and sentenced to death. There is no suggestion that he was incompetent at the time of his offense, at trial, or at sentenc-

---

*Briefs of *amici curiae* urging reversal were filed for the American Psychiatric Association by *Joel I. Klein* and *Robert D. Luskin;* for the American Psychological Association et al. by *Donald N. Bersoff* and *Bruce J. Ennis, Jr.;* and for the Capital Collateral Representative et al. by *Sanford L. Bohrer.*

ing.   In early 1982, however, Ford began to manifest grad-
ual changes in behavior.   They began as an occasional
peculiar idea or confused perception, but became more seri-
ous over time.   After reading in the newspaper that the Ku
Klux Klan had held a rally in nearby Jacksonville, Florida,
Ford developed an obsession focused upon the Klan.   His
letters to various people reveal endless brooding about his
"Klan work," and an increasingly pervasive delusion that he
had become the target of a complex conspiracy, involving the
Klan and assorted others, designed to force him to commit
suicide.   He believed that the prison guards, part of the con-
spiracy, had been killing people and putting the bodies in the
concrete enclosures used for beds.   Later, he began to be-
lieve that his women relatives were being tortured and sexu-
ally abused somewhere in the prison.   This notion developed
into a delusion that the people who were tormenting him at
the prison had taken members of Ford's family hostage.
The hostage delusion took firm hold and expanded, until Ford
was reporting that 135 of his friends and family were being
held hostage in the prison, and that only he could help them.
By "day 287" of the "hostage crisis," the list of hostages had
expanded to include "senators, Senator Kennedy, and many
other leaders."   App. 53.   In a letter to the Attorney Gen-
eral of Florida, written in 1983, Ford appeared to assume au-
thority for ending the "crisis," claiming to have fired a num-
ber of prison officials.   He began to refer to himself as "Pope
John Paul, III," and reported having appointed nine new jus-
tices to the Florida Supreme Court.   Id., at 59.

Counsel for Ford asked a psychiatrist who had examined
Ford earlier, Dr. Jamal Amin, to continue seeing him and to
recommend appropriate treatment.   On the basis of roughly
14 months of evaluation, taped conversations between Ford
and his attorneys, letters written by Ford, interviews with
Ford's acquaintances, and various medical records, Dr. Amin
concluded in 1983 that Ford suffered from "a severe, uncon-
trollable, mental disease which closely resembles 'Paranoid

Schizophrenia With Suicide Potential'"—a "major mental disorder . . . severe enough to substantially affect Mr. Ford's present ability to assist in the defense of his life." *Id.*, at 91.

Ford subsequently refused to see Dr. Amin again, believing him to have joined the conspiracy against him, and Ford's counsel sought assistance from Dr. Harold Kaufman, who interviewed Ford in November 1983. Ford told Dr. Kaufman that "I know there is some sort of death penalty, but I'm free to go whenever I want because it would be illegal and the executioner would be executed." *Id.*, at 65. When asked if he would be executed, Ford replied: "I can't be executed because of the landmark case. I won. Ford v. State will prevent executions all over." *Id.*, at 66. These statements appeared amidst long streams of seemingly unrelated thoughts in rapid succession. Dr. Kaufman concluded that Ford had no understanding of why he was being executed, made no connection between the homicide of which he had been convicted and the death penalty, and indeed sincerely believed that he would not be executed because he owned the prisons and could control the Governor through mind waves. *Id.*, at 67. Dr. Kaufman found that there was "no reasonable possibility that Mr. Ford was dissembling, malingering or otherwise putting on a performance . . . ." *Id.*, at 65. The following month, in an interview with his attorneys, Ford regressed further into nearly complete incomprehensibility, speaking only in a code characterized by intermittent use of the word "one," making statements such as "Hands one, face one. Mafia one. God one, father one, Pope one. Pope one. Leader one." *Id.*, at 72.

Counsel for Ford invoked the procedures of Florida law governing the determination of competency of a condemned inmate, Fla. Stat. § 922.07 (1985). Following the procedures set forth in the statute, the Governor of Florida appointed a panel of three psychiatrists to evaluate whether, under § 922.07(2), Ford had "the mental capacity to understand the nature of the death penalty and the reasons why it was im-

posed upon him." At a single meeting, the three psychiatrists together interviewed Ford for approximately 30 minutes. Each doctor then filed a separate two- or three-page report with the Governor, to whom the statute delegates the final decision. One doctor concluded that Ford suffered from "psychosis with paranoia" but had "enough cognitive functioning to understand the nature and the effects of the death penalty, and why it is to be imposed on him." App. 103. Another found that, although Ford was "psychotic," he did "know fully what can happen to him." *Id.*, at 105–106. The third concluded that Ford had a "severe adaptational disorder," but did "comprehend his total situation including being sentenced to death, and all of the implications of that penalty." *Id.*, at 99–100. He believed that Ford's disorder, "although severe, seem[ed] contrived and recently learned." *Id.*, at 100. Thus, the interview produced three different diagnoses, but accord on the question of sanity as defined by state law.

The Governor's decision was announced on April 30, 1984, when, without explanation or statement, he signed a death warrant for Ford's execution. Ford's attorneys unsuccessfully sought a hearing in state court to determine anew Ford's competency to suffer execution. *Ford* v. *Wainwright*, 451 So. 2d 471, 475 (Fla. 1984). Counsel then filed a petition for habeas corpus in the United States District Court for the Southern District of Florida, seeking an evidentiary hearing on the question of Ford's sanity, proffering the conflicting findings of the Governor-appointed commission and subsequent challenges to their methods by other psychiatrists. The District Court denied the petition without a hearing. The Court of Appeals granted a certificate of probable cause and stayed Ford's execution, *Ford* v. *Strickland*, 734 F. 2d 538 (CA11 1984), and we rejected the State's effort to vacate the stay of execution. *Wainwright* v. *Ford*, 467 U. S. 1220 (1984). The Court of Appeals then addressed the merits of Ford's claim and a divided panel affirmed the Dis-

trict Court's denial of the writ. 752 F. 2d 526 (CA11 1985). This Court granted Ford's petition for certiorari in order to resolve the important issue whether the Eighth Amendment prohibits the execution of the insane and, if so, whether the District Court should have held a hearing on petitioner's claim. 474 U. S. 1019 (1985).

## II

Since this Court last had occasion to consider the infliction of the death penalty upon the insane, our interpretations of the Due Process Clause and the Eighth Amendment have evolved substantially. In *Solesbee* v. *Balkcom*, 339 U. S. 9 (1950), a condemned prisoner claimed a due process right to a judicial determination of his sanity, yet the Court did not consider the possible existence of a right under the Eighth Amendment, which had not yet been applied to the States. The sole question the Court addressed was whether Georgia's procedure for ascertaining sanity adequately effectuated that State's own policy of sparing the insane from execution. See also *Caritativo* v. *California*, 357 U. S. 549 (1958); *United States ex rel. Smith* v. *Baldi*, 344 U. S. 561 (1953); *Phyle* v. *Duffy*, 334 U. S. 431 (1948); *Nobles* v. *Georgia*, 168 U. S. 398 (1897). Now that the Eighth Amendment has been recognized to affect significantly both the procedural and the substantive aspects of the death penalty, the question of executing the insane takes on a wholly different complexion. The adequacy of the procedures chosen by a State to determine sanity, therefore, will depend upon an issue that this Court has never addressed: whether the Constitution places a substantive restriction on the State's power to take the life of an insane prisoner.

There is now little room for doubt that the Eighth Amendment's ban on cruel and unusual punishment embraces, at a minimum, those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted. See *Solem* v. *Helm*, 463 U. S. 277, 285–286 (1983); *id.*, at 312–313 (BURGER, C. J., joined by

WHITE, REHNQUIST, and O'CONNOR, JJ., dissenting); *Furman* v. *Georgia*, 408 U. S. 238, 264 (1972) (BRENNAN, J., concurring); *McGautha* v. *California*, 402 U. S. 183, 226 (1971) (Black, J., concurring). "Although the Framers may have intended the Eighth Amendment to go beyond the scope of its English counterpart, their use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection . . . ." *Solem* v. *Helm, supra,* at 286.

Moreover, the Eighth Amendment's proscriptions are not limited to those practices condemned by the common law in 1789. See *Gregg* v. *Georgia*, 428 U. S. 153, 171 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). Not bound by the sparing humanitarian concessions of our forebears, the Amendment also recognizes the "evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). In addition to considering the barbarous methods generally outlawed in the 18th century, therefore, this Court takes into account objective evidence of contemporary values before determining whether a particular punishment comports with the fundamental human dignity that the Amendment protects. See *Coker* v. *Georgia*, 433 U. S. 584, 597 (1977) (plurality opinion).

## A

We begin, then, with the common law. The bar against executing a prisoner who has lost his sanity bears impressive historical credentials; the practice consistently has been branded "savage and inhuman." 4 W. Blackstone, Commentaries *24–*25 (hereinafter Blackstone). Blackstone explained:

> "[I]diots and lunatics are not chargeable for their own acts, if committed when under these incapacities: no, not even for treason itself. Also, if a man in his sound memory commits a capital offence, and before arraignment for it, he becomes mad, he ought not to be arraigned for

it: because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried: for how can he make his defence? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of nonsane memory, execution shall be stayed: for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution." *Ibid.* (footnotes omitted).

Sir Edward Coke had earlier expressed the same view of the common law of England: "[B]y intendment of Law the execution of the offender is for example, . . . but so it is not when a mad man is executed, but should be a miserable spectacle, both against Law, and of extream inhumanity and cruelty, and can be no example to others." 3 E. Coke, Institutes 6 (6th ed. 1680) (hereinafter Coke). Other recorders of the common law·concurred. See 1 M. Hale, Pleas of the Crown 35 (1736) (hereinafter Hale); 1 W. Hawkins, Pleas of the Crown 2 (7th ed. 1795) (hereinafter Hawkins); Hawles, Remarks on the Trial of Mr. Charles Bateman, 11 How. St. Tr. 474, 477 (1685) (hereinafter Hawles).

As is often true of common-law principles, see O. Holmes, The Common Law 5 (1881), the reasons for the rule are less sure and less uniform than the rule itself. One explanation is that the execution of an insane person simply offends humanity, Coke 6; another, that it provides no example to others and thus contributes nothing to whatever deterrence value is intended to be served by capital punishment. *Ibid.* Other commentators postulate religious underpinnings: that it is uncharitable to dispatch an offender "into another world, when he is not of a capacity to fit himself for it," Hawles 477. It is also said that execution serves no purpose in these cases because madness is its own punishment: *furiosus*

*solo furore punitur.* Blackstone *395. More recent commentators opine that the community's quest for "retribution"—the need to offset a criminal act by a punishment of equivalent "moral quality"—is not served by execution of an insane person, which has a "lesser value" than that of the crime for which he is to be punished. Hazard & Louisell, Death, the State, and the Insane: Stay of Execution, 9 UCLA L. Rev. 381, 387 (1962). Unanimity of rationale, therefore, we do not find. "But whatever the reason of the law is, it is plain the law is so." Hawles 477. We know of virtually no authority condoning the execution of the insane at English common law.[1]

Further indications suggest that this solid proscription was carried to America, where it was early observed that "the judge is bound" to stay the execution upon insanity of the prisoner. 1 J. Chitty, A Practical Treatise on the Criminal Law *761; see 1 F. Wharton, A Treatise on Criminal Law § 59 (8th ed. 1880).

### B

This ancestral legacy has not outlived its time. Today, no State in the Union permits the execution of the insane.[2] It

---

[1] At one point, Henry VIII enacted a law requiring that if a man convicted of treason fell mad, he should nevertheless be executed. 33 Hen. VIII, ch. 20. This law was uniformly condemned. See Blackstone *25; 1 Hale 35; 1 Hawkins 2. The "cruel and inhumane Law lived not long, but was repealed, for in that point also it was against the Common Law . . . ." Coke 6.

[2] Of the 50 States, 41 have a death penalty or statutes governing execution procedures. Of those, 26 have statutes explicitly requiring the suspension of the execution of a prisoner who meets the legal test for incompetence. See Ala. Code § 15–16–23 (1982); Ariz. Rev. Stat. Ann. § 13–4023 (1978); Ark. Stat. Ann. § 43–2622 (1977); Cal. Penal Code Ann. § 3703 (West 1982); Colo. Rev. Stat. § 16–8–112(2) (Supp. 1985); Conn. Gen. Stat. § 54–101 (1985); Fla. Stat. § 922.07 (1985 and Supp. 1986); Ga. Code Ann. § 17–10–62 (1982); Ill. Rev. Stat., ch. 38, ¶ 1005–2–3 (1982); Kan. Stat. Ann. § 22–4006(3) (1981); Ky. Rev. Stat § 431.240(2) (1985); Md. Ann. Code, Art. 27, § 75(c) (Supp. 1985); Miss. Code Ann. § 99–19–57(2) (Supp. 1985);

is clear that the ancient and humane limitation upon the State's ability to execute its sentences has as firm a hold upon the jurisprudence of today as it had centuries ago in England. The various reasons put forth in support of the common-law restriction have no less logical, moral, and practical force than they did when first voiced. For today, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life. See Note, The Eighth Amendment and the Execution of the Presently Incompetent, 32 Stan. L. Rev. 765, 777, n. 58 (1980). Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across this Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude that the Eighth Amendment

---

Mo. Rev. Stat § 552.060 (1978); Mont. Code Ann. § 46–14–221 (1984); Neb. Rev. Stat. § 29–2537 (1979); Nev. Rev. Stat. § 176.445 (1985); N. J. Stat. Ann. § 30:4–82 (West 1981); N. M. Stat. Ann. § 31–14–6 (1984); N. Y. Correc. Law § 656 (McKinney Supp. 1986); N. C. Gen. Stat. § 15A–1001 (1983); Ohio Rev. Code Ann. § 2949.29 (1982); Okla. Stat., Tit. 22, § 1008 (1986); S. D. Codified Laws § 23A–27A–24 (1979); Utah Code Ann. § 77–19–13 (1982); Wyo. Stat. § 7–13–901 (Supp. 1986). Others have adopted the common-law rule by judicial decision. See *State* v. *Allen*, 204 La. 513, 515, 15 So. 2d 870, 871 (1943); *Commonwealth* v. *Moon*, 383 Pa. 18, 22–23, 117 A. 2d 96, 99 (1955); *Jordan* v. *State*, 124 Tenn. 81, 89–90 135 S. W. 327, 329 (1911); *State* v. *Davis*, 6 Wash. 2d 696, 717, 108 P. 2d 641, 651 (1940). Still others have more discretionary statutory procedures providing for the suspension of sentence and transfer to mental facilities for convicted prisoners who have developed mental illness. See Del. Code Ann., Tit. 11, § 406 (1979); Ind. Code § 11–10–4–2 (1982); Mass. Gen. Laws, ch. 279, § 62 (1984); R. I. Gen. Laws § 40.1–5.3–7 (1984); S. C. Code § 44–23–220 (1985); Tex. Code Crim. Proc. Ann., Art. 46.01 (1979); Va. Code § 19.2–177 (1983). The remaining four States having a death penalty have no specific procedure governing insanity, but have not repudiated the common-law rule.

prohibits a State from carrying out a sentence of death upon a prisoner who is insane. Whether its aim be to protect the condemned from fear and pain without comfort of understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance, the restriction finds enforcement in the Eighth Amendment.

## III

The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane. Petitioner's allegation of insanity in his habeas corpus petition, if proved, therefore, would bar his execution. The question before us is whether the District Court was under an obligation to hold an evidentiary hearing on the question of Ford's sanity. In answering that question, we bear in mind that, while the underlying social values encompassed by the Eighth Amendment are rooted in historical traditions, the manner in which our judicial system protects those values is purely a matter of contemporary law. Once a substantive right or restriction is recognized in the Constitution, therefore, its enforcement is in no way confined to the rudimentary process deemed adequate in ages past.

## A

In a habeas corpus proceeding, "a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Townsend* v. *Sain*, 372 U. S. 293, 312–313 (1963). The habeas corpus statute, following this Court's decision in *Townsend*, provides that, in general, "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . , shall be presumed to be correct," and an evidentiary hearing not required. 28 U. S. C. § 2254(d). In this case, it is clear that no state court has issued any determination to which that presumption of correctness could be said to attach; indeed, no court played any role in the rejection of petitioner's claim of insanity. Thus, quite simply,

*Townsend* and § 2254 require the District Court to grant a hearing *de novo* on that question.

But our examination does not stop there. For even when a state court has rendered judgment, a federal court is obliged to hold an evidentiary hearing on habeas corpus if, among other factors, "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing," § 2254(d)(2); or "the material facts were not adequately developed at the State court hearing," § 2254(d)(3); or "the applicant did not receive a full, fair, and adequate hearing in the State court proceeding." § 2254(d)(6). If federal factfinding is to be avoided, then, in addition to providing a court judgment on the constitutional question, the State must also ensure that its procedures are adequate for the purpose of finding the facts.

## B

The adequacy of a state-court procedure under *Townsend* is largely a function of the circumstances and the interests at stake. In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. See, *e. g., Spaziano* v. *Florida*, 468 U. S. 447, 456 (1984). This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different. See *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).

Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any

other aspect of a capital proceeding. Indeed, a particularly acute need for guarding against error inheres in a determination that "in the present state of the mental sciences is at best a hazardous guess however conscientious." *Solesbee* v. *Balkcom*, 339 U. S., at 23 (Frankfurter, J., dissenting). That need is greater still because the ultimate decision will turn on the finding of a single fact, not on a range of equitable considerations. Cf. *Woodson* v. *North Carolina, supra,* at 304. In light of these concerns, the procedures employed in petitioner's case do not fare well.

## C

Florida law directs the Governor, when informed that a person under sentence of death may be insane, to stay the execution and appoint a commission of three psychiatrists to examine the prisoner. Fla. Stat. § 922.07 (1985 and Supp. 1986). "The examination of the convicted person shall take place with all three psychiatrists present at the same time." *Ibid.* After receiving the report of the commission, the Governor must determine whether "the convicted person has the mental capacity to understand the nature of the death penalty and the reasons why it was imposed on him." *Ibid.* If the Governor finds that the prisoner has that capacity, then a death warrant is issued; if not, then the prisoner is committed to a mental health facility. The procedure is conducted wholly within the executive branch, *ex parte,* and provides the exclusive means for determining sanity. *Ford* v. *Wainwright*, 451 So. 2d, at 475.

Petitioner received the statutory process. The Governor selected three psychiatrists, who together interviewed Ford for a total of 30 minutes, in the presence of eight other people, including Ford's counsel, the State's attorneys, and correctional officials. The Governor's order specifically directed that the attorneys should not participate in the examination in any adversarial manner. This order was consistent with the present Governor's "publicly announced pol-

icy of excluding all advocacy on the part of the condemned from the process of determining whether a person under a sentence of death is insane." *Goode* v. *Wainwright*, 448 So. 2d 999, 1001 (Fla. 1984).

After submission of the reports of the three examining psychiatrists, reaching conflicting diagnoses but agreeing on the ultimate issue of competency, Ford's counsel attempted to submit to the Governor some other written materials, including the reports of the two other psychiatrists who had examined Ford at greater length, one of whom had concluded that the prisoner was not competent to suffer execution. The Governor's office refused to inform counsel whether the submission would be considered. The Governor subsequently issued his decision in the form of a death warrant. That this most cursory form of procedural review fails to achieve even the minimal degree of reliability required for the protection of any constitutional interest, and thus falls short of adequacy under *Townsend*, is self-evident.

## IV

### A

The first deficiency in Florida's procedure lies in its failure to include the prisoner in the truth-seeking process. Notwithstanding this Court's longstanding pronouncement that "[t]he fundamental requisite of due process of law is the opportunity to be heard," *Grannis* v. *Ordean*, 234 U. S. 385, 394 (1914), state practice does not permit any material relevant to the ultimate decision to be submitted on behalf of the prisoner facing execution. In all other proceedings leading to the execution of an accused, we have said that the factfinder must "have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek* v. *Texas*, 428 U. S. 262, 276 (1976) (plurality opinion). And we have forbidden States to limit the capital defendant's submission of relevant evidence in mitigation of the sentence. *Skipper* v. *South Carolina*, 476 U. S. 1, 8

(1986); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (joint opinion). It would be odd were we now to abandon our insistence upon unfettered presentation of relevant information, before the final fact antecedent to execution has been found.

Rather, consistent with the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life, we believe that any procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate. "[T]he minimum assurance that the life-and-death guess will be a truly informed guess requires respect for the basic ingredient of due process, namely, an opportunity to be allowed to substantiate a claim before it is rejected." *Solesbee* v. *Balkcom, supra,* at 23 (Frankfurter, J., dissenting).

We recently had occasion to underscore the value to be derived from a factfinder's consideration of differing psychiatric opinions when resolving contested issues of mental state. In *Ake* v. *Oklahoma*, 470 U. S. 68 (1985), we recognized that, because "psychiatrists disagree widely and frequently on what constitutes mental illness [and] on the appropriate diagnosis to be attached to given behavior and symptoms," the factfinder must resolve differences in opinion within the psychiatric profession "on the basis of the evidence offered by each party" when a defendant's sanity is at issue in a criminal trial. *Id.,* at 81. The same holds true after conviction; without any adversarial assistance from the prisoner's representative—especially when the psychiatric opinion he proffers is based on much more extensive evaluation than that of the state-appointed commission—the factfinder loses the substantial benefit of potentially probative information. The result is a much greater likelihood of an erroneous decision.

## B

A related flaw in the Florida procedure is the denial of any opportunity to challenge or impeach the state-appointed psychiatrists' opinions. "[C]ross-examination . . . is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 J. Wigmore, Evidence § 1367 (J. Chadbourn rev. 1974). Cross-examination of the psychiatrists, or perhaps a less formal equivalent, would contribute markedly to the process of seeking truth in sanity disputes by bringing to light the bases for each expert's beliefs, the precise factors underlying those beliefs, any history of error or caprice of the examiner, any personal bias with respect to the issue of capital punishment, the expert's degree of certainty about his or her own conclusions, and the precise meaning of ambiguous words used in the report. Without some questioning of the experts concerning their technical conclusions, a factfinder simply cannot be expected to evaluate the various opinions, particularly when they are themselves inconsistent. See *Barefoot* v. *Estelle*, 463 U. S. 880, 899 (1983). The failure of the Florida procedure to afford the prisoner's representative any opportunity to clarify or challenge the state experts' opinions or methods creates a significant possibility that the ultimate decision made in reliance on those experts will be distorted.[3]

---

[3] The adequacy of the factfinding procedures is further called into question by the cursory nature of the underlying psychiatric examination itself. While this Court does not purport to set substantive guidelines for the development of expert psychiatric opinion, cf. *Barefoot* v. *Estelle*, 463 U. S. 880, 903 (1983), we can say that the goal of reliability is unlikely to be served by a single group interview, with no provision for the exercise of the psychiatrists' professional judgment regarding the possible need for different or more comprehensive evaluative techniques. The inconsistency and vagueness of the conclusions reached by the three examining psychiatrists in this case attest to the dubious value of such an examination.

## C

Perhaps the most striking defect in the procedures of Fla. Stat. § 922.07 (1985 and Supp. 1986), as noted earlier, is the State's placement of the decision wholly within the executive branch. Under this procedure, the person who appoints the experts and ultimately decides whether the State will be able to carry out the sentence that it has long sought is the Governor, whose subordinates have been responsible for initiating every stage of the prosecution of the condemned from arrest through sentencing. The commander of the State's corps of prosecutors cannot be said to have the neutrality that is necessary for reliability in the factfinding proceeding.

Historically, delay of execution on account of insanity was not a matter of executive clemency *(ex mandato regis)* or judicial discretion *(ex arbitrio judicis);* rather, it was required by law *(ex necessitate legis).* 1 N. Walker, Crime and Insanity in England 196 (1968). Thus, history affords no better basis than does logic for placing the final determination of a fact, critical to the trigger of a constitutional limitation upon the State's power, in the hands of the State's own chief executive. In no other circumstance of which we are aware is the vindication of a constitutional right entrusted to the unreviewable discretion of an administrative tribunal.

## V

## A

Having identified various failings of the Florida scheme, we must conclude that the State's procedures for determining sanity are inadequate to preclude federal redetermination of the constitutional issue. We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction

upon its execution of sentences.[4]    It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity.    Cf. *Pate* v. *Robinson*, 383 U. S. 375, 387 (1966) (hearing on competency to stand trial required if "sufficient doubt" of competency exists).    Other legitimate pragmatic considerations may also supply the boundaries of the procedural safeguards that feasibly can be provided.

Yet the lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the factfinding determination.    The stakes are high, and the "evidence" will always be imprecise.    It is all the more important that the adversary presentation of relevant information be as unrestricted as possible.    Also essential is that the manner of selecting and using the experts responsible for producing that "evidence" be conducive to the formation of neutral, sound, and professional judgments as to the prisoner's ability to comprehend the nature of the penalty.    Fidelity to these principles is the solemn obligation of a civilized society.

B

Today we have explicitly recognized in our law a principle that has long resided there.    It is no less abhorrent today than it has been for centuries to exact in penance the life of one whose mental illness prevents him from comprehending the reasons for the penalty or its implications.    In light of the

---

[4] Instructive analogies may be found in the State's own procedures for determining whether a defendant is competent to stand trial, Fla. Stat. §§ 916.11–916.12 (1985 and Supp. 1986), or in the comprehensive safeguards that Florida ensures to those subjected to involuntary commitment proceedings, Fla. Stat. § 394.467 (1986).    The parties' interests are of course somewhat different in those contexts; nevertheless, all such inquests share the common goal of reaching a fair assessment of the subject's mental state.

clear need for trustworthiness in any factual finding that will prevent or permit the carrying out of an execution, we hold that Fla. Stat. § 922.07 (1985 and Supp. 1986) provides inadequate assurances of accuracy to satisfy the requirements of *Townsend* v. *Sain,* 372 U. S. 293 (1963). Having been denied a factfinding procedure "adequate to afford a full and fair hearing" on the critical issue, 28 U. S. C. § 2254(d)(2), petitioner is entitled to an evidentiary hearing in the District Court, *de novo,* on the question of his competence to be executed. *Townsend* v. *Sain, supra,* at 312.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring in part and concurring in the judgment.

I join Parts I and II of the Court's opinion. As JUSTICE MARSHALL ably demonstrates, execution of the insane was barred at common law precisely because it was considered cruel and unusual. In *Solem* v. *Helm,* 463 U. S. 277 (1983), we explained that while the Framers "may have intended the Eighth Amendment to go beyond the scope of its English counterpart, their use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection." *Id.,* at 286. It follows that the practice of executing the insane is barred by our own Constitution.

That conclusion leaves two issues for our determination: (i) the meaning of insanity in this context, and (ii) the procedures States must follow in order to avoid the necessity of *de novo* review in federal courts under 28 U. S. C. § 2254(d). The Court's opinion does not address the first of these issues, and as to the second, my views differ substantially from JUSTICE MARSHALL's. I therefore write separately.

## I

The Court holds today that the Eighth Amendment bars execution of a category of defendants defined by their mental state. The bounds of that category are necessarily governed by federal constitutional law. I therefore turn to the same sources that give rise to the substantive right to determine its precise definition: chiefly, our common-law heritage and the modern practices of the States, which are indicative of our "evolving standards of decency." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). See *Solem* v. *Helm*, *supra*, at 284–286; *Gregg* v. *Georgia*, 428 U. S. 153, 175–176 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).

## A

As the Court recognizes, *ante*, at 407–408, the ancient prohibition on execution of the insane rested on differing theories. Those theories do not provide a common answer when it comes to defining the mental awareness required by the Eighth Amendment as a prerequisite to a defendant's execution. On the one hand, some authorities contended that the prohibition against executing the insane was justified as a way of preserving the defendant's ability to make arguments on his own behalf. See 1 M. Hale, Pleas of the Crown 35 (1736) ("if after judgment he become of *non sane memory*, his execution shall be spared; for were he of sound memory he might allege somewhat in stay of judgment or execution"); accord 4 W. Blackstone, Commentaries *388–*389. Other authorities suggest, however, that the prohibition derives from more straightforward humanitarian concerns. Coke expressed the view that execution was intended to be an "example" to the living, but that the execution of "a mad man" was such "a miserable spectacle . . . of extream inhumanity and cruelty" that it "can be no example to others." 3 E. Coke, Institutes 6 (1794). Hawles added that it is "against christian charity to send a great offender quick . . . into another world, when he is not of a capacity to fit himself for it."

Hawles, Remarks on the Trial of Mr. Charles Bateman, 11 How. St. Tr. 474, 477 (1685).

The first of these justifications has slight merit today. Modern practice provides far more extensive review of convictions and sentences than did the common law, including not only direct appeal but ordinarily both state and federal collateral review.[1]  Throughout this process, the defendant has access to counsel, by constitutional right at trial, and by employment or appointment at other stages of the process whenever the defendant raises substantial claims.  Nor does the defendant merely have the right to counsel's assistance; he also has the right to the *effective* assistance of counsel at trial and on appeal.  *Evitts* v. *Lucey*, 469 U. S. 387 (1985); *Strickland* v. *Washington*, 466 U. S. 668 (1984).  See *Kimmelman* v. *Morrison, ante,* at 392–393 (POWELL, J., concurring in judgment).  These guarantees are far broader than those enjoyed by criminal defendants at common law. It is thus unlikely indeed that a defendant today could go to his death with knowledge of undiscovered trial error that might set him free.

In addition, in cases tried at common law execution often followed fairly quickly after trial, so that incompetence at the

---

[1] Petitioner offers a good example.  Petitioner was convicted of first-degree murder in 1974.  On direct appeal, his conviction and sentence were affirmed, *Ford* v. *State,* 374 So. 2d 496 (Fla. 1979), and this Court denied certiorari.  445 U. S. 972 (1980).  Petitioner then joined 122 other death row inmates in seeking extraordinary relief from the Florida Supreme Court, based on that court's allegedly improper procedure for review of capital cases.  This petition for relief was denied, *Brown* v. *Wainwright,* 392 So. 2d 1327 (Fla. 1981), and this Court again denied certiorari.  454 U. S. 1000 (1981).  Petitioner filed a motion for postconviction relief in state court, and relief was again denied.  *Ford* v. *State,* 407 So. 2d 907 (Fla. 1981).  Following these unsuccessful attempts to obtain relief from his conviction or execution in state court, petitioner filed a petition for habeas corpus in federal court.  Relief was again denied, *Ford* v. *Strickland,* 696 F. 2d 804 (CA11) (en banc), cert. denied, 464 U. S. 865 (1983).  Only after all of these challenges had been resolved against him did petitioner challenge his impending execution on the ground of insanity.

time of execution was linked as a practical matter with incompetence at the trial itself. Our decisions already recognize, however, that a defendant must be competent to stand trial, and thus the notion that a defendant must be able to assist in his defense is largely provided for. See *Drope* v. *Missouri*, 420 U. S. 162 (1975).[2]

## B

The more general concern of the common law—that executions of the insane are simply cruel—retains its vitality. It is as true today as when Coke lived that most men and women value the opportunity to prepare, mentally and spiritually, for their death. Moreover, today as at common law, one of the death penalty's critical justifications, its retributive force, depends on the defendant's awareness of the penalty's existence and purpose. Thus, it remains true that executions of the insane both impose a uniquely cruel penalty and are inconsistent with one of the chief purposes of executions generally. For precisely these reasons, Florida requires the Governor to stay executions of those who "d[o] not have the mental capacity to understand the nature of the death penalty and why it was imposed" on them. Fla. Stat. § 922.07 (1985 and Supp. 1986). See also Ill. Rev. Stat., ch. 38, ¶ 1005-2-3(a) (1985) ("A person is unfit to be executed if because of a mental condition he is unable to understand the nature and purpose of such sentence"); *State* v. *Pastet*, 169 Conn. 13, 28, 363 A. 2d 41, 49 (question is "whether the defendant was able to understand the nature of the sentencing proceedings, i. e., why he was being punished and the nature of his punishment"), cert. denied, 423 U. S. 937 (1975). A number of

---

[2] Moreover, a standard that focused on the defendant's ability to assist in his defense would give too little weight to the State's interest in finality, since it implies a constitutional right to raise new challenges to one's criminal conviction until sentence has run its course. Such an implication is false: we have made clear that States have a strong and legitimate interest in avoiding repetitive collateral review through procedural bars. See *Kuhlmann* v. *Wilson, post*, at 452–454 (plurality opinion).

States have more rigorous standards,[3] but none disputes the need to require that those who are executed know the fact of their impending execution and the reason for it.

Such a standard appropriately defines the kind of mental deficiency that should trigger the Eighth Amendment prohibition. If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.

Petitioner's claim of insanity plainly fits within this standard. According to petitioner's proffered psychiatric examination, petitioner does not know that he is to be executed, but rather believes that the death penalty has been invalidated. App. 65–67. If this assessment is correct, petitioner

_____

[3] A number of States have remained faithful to Blackstone's view that a defendant cannot be executed unless he is able to assist in his own defense. *E. g.*, Miss. Code Ann. § 99–19–57(2)(b) (Supp. 1985); Mo. Rev. Stat. § 552.060(1) (1978); Utah Code Ann. § 77–15–2 (1982). The majority of States appear not to have addressed the issue in their statutes. Modern case authority on this question is sparse, and while some older cases favor the Blackstone view, see 24 C. J. S., Criminal Law § 1619 (1961), those cases largely antedate the recent expansion of both the right to counsel and the availability of federal and state collateral review. Moreover, other cases suggest that the prevailing test is "whether the condemned man was aware of his conviction and the nature of his impending fate"—essentially the same test stated by Florida's statute. Note, Insanity of the Condemned, 88 Yale L. J. 533, 540 (1979); see Hazard & Louisell, Death, the State, and the Insane: Stay of Execution, 9 UCLA L. Rev. 381, 394, and n. 44 (1962) (discussing cases). Under these circumstances, I find no sound basis for constitutionalizing the broader definition of insanity, with its requirement that the defendant be able to assist in his own defense. States are obviously free to adopt a more expansive view of sanity in this context than the one the Eighth Amendment imposes as a constitutional minimum.

cannot connect his execution to the crime for which he was convicted. Thus, the question is whether petitioner's evidence entitles him to a hearing in Federal District Court on his claim.

## II

Petitioner concedes that the Governor of Florida has determined that he is not insane under the standard prescribed by Florida's statute, which is the same as the standard just described. Petitioner further concedes that there is expert evidence that supports the Governor's finding. Thus, if that finding is entitled to a presumption of correctness under 28 U. S. C. § 2254(d), there is no ground for holding a hearing on petitioner's federal habeas corpus petition.

I agree with JUSTICE MARSHALL that the Governor's finding is not entitled to a presumption of correctness under § 2254(d). I reach this conclusion for two independent reasons. First, § 2254(d) requires deference to the factual findings of "a State court of competent jurisdiction." The term "State court" may have a certain amount of flexibility,[4] but no amount of stretching can extend it to include the Governor. The essence of a "court" is independence from the prosecutorial arm of government and, as JUSTICE MARSHALL correctly notes, the Governor is "[t]he commander of the State's corps of prosecutors." *Ante*, at 416. Unless the relevant language is to be read out of the statute, I see no basis for affording any deference to the Governor's determination.

Second, the presumption of correctness does not attach to the Governor's implicit finding of sanity because the State did not give petitioner's claim "a full and fair hearing," 28 U. S. C. § 2254(d)(2). This statutory phrase apparently was drawn from the Court's opinion in *Townsend* v. *Sain*, 372 U. S. 293, 313 (1963). There, the Court concluded that where the state court's "fact-finding procedure . . . was not

---

[4] Although we need not decide the issue in this case, the term "State court" may well encompass an independent panel of psychiatric experts who might both examine the defendant and determine his legal sanity.

adequate for reaching reasonably correct results," or where the process "appear[ed] to be seriously inadequate for the ascertainment of the truth," no presumption of correctness would attach to the state court's findings when those findings were challenged on federal habeas corpus. *Id.*, at 316.

At least in the context of competency determinations prior to execution, this standard is no different from the protection afforded by procedural due process. It is clear that an insane defendant's Eighth Amendment interest in forestalling his execution unless or until he recovers his sanity cannot be deprived without a "fair hearing." Indeed, fundamental fairness is the hallmark of the procedural protections afforded by the Due Process Clause. See *Lassiter* v. *Department of Social Services of Durham County*, 452 U. S. 18, 24–25 (1981). Thus, the question in this case is whether Florida's procedures for determining petitioner's sanity comport with the requirements of due process.

Together with JUSTICE MARSHALL and JUSTICE O'CONNOR, I would hold that they do not. As JUSTICE O'CONNOR states, "[i]f there is one 'fundamental requisite' of due process, it is that an individual is entitled to an 'opportunity to be heard.'" *Post*, at 430 (quoting *Grannis* v. *Ordean*, 234 U. S. 385, 394 (1914)). In this case, petitioner was deprived of that opportunity. The Florida statute does not require the Governor to consider materials submitted by the prisoner, and the present Governor has a "publicly announced policy of excluding" such materials from his consideration. *Goode* v. *Wainwright*, 448 So. 2d 999, 1001 (Fla. 1984). Thus, the determination of petitioner's sanity appears to have been made *solely* on the basis of the examinations performed by state-appointed psychiatrists. Such a procedure invites arbitrariness and error by preventing the affected parties from offering contrary medical evidence or even from explaining the inadequacies of the State's examinations. It does not, therefore, comport with due process. It follows that the State's procedure was not "fair," and that the Dis-

trict Court on remand must consider the question of petitioner's competency to be executed.

## III

While the procedures followed by Florida in this case do not comport with basic fairness, I would not require the kind of full-scale "sanity trial" that JUSTICE MARSHALL appears to find necessary. See *ante*, at 413–416, 418. Due process is a flexible concept, requiring only "such procedural protections as the particular situation demands." *Mathews* v. *Eldridge*, 424 U. S. 319, 334 (1976); *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). See also *post*, at 429 (O'CONNOR, J., concurring in result in part and dissenting in part). In this instance, a number of considerations support the conclusion that the requirements of due process are not as elaborate as JUSTICE MARSHALL suggests.

First, the Eighth Amendment claim at issue can arise only after the prisoner has been validly convicted of a capital crime and sentenced to death. Thus, in this case the State has a substantial and legitimate interest in taking petitioner's life as punishment for his crime. That interest is not called into question by petitioner's claim. Rather, the only question raised is not *whether*, but *when*, his execution may take place.[5] This question is important, but it is not comparable to the antecedent question whether petitioner should be executed at all. It follows that this Court's decisions imposing heightened procedural requirements on capital trials and sentencing proceedings—*e. g.*, *Lockett* v. *Ohio*, 438 U. S. 586 (1978) (plurality opinion); *Turner* v. *Murray*, 476 U. S. 28 (1986)—do not apply in this context.

Second, petitioner does not make his claim of insanity against a neutral background. On the contrary, in order to

---

[5] It is of course true that some defendants may lose their mental faculties and never regain them, and thus avoid execution altogether. My point is only that if petitioner is cured of his disease, the State is free to execute him.

have been convicted and sentenced, petitioner must have been judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a serious question for the trial court. The State therefore may properly presume that petitioner remains sane at the time sentence is to be carried out,[6] and may require a substantial threshold showing of insanity merely to trigger the hearing process. Cf. *Ake* v. *Oklahoma*, 470 U. S. 68, 82–83 (1985).

Finally, the sanity issue in this type of case does not resemble the basic issues at trial or sentencing. Unlike issues of historical fact, the question of petitioner's sanity calls for a basically subjective judgment. See *Addington* v. *Texas*, 441 U. S. 418, 429–430 (1979); cf. *Barefoot* v. *Estelle*, 463 U. S. 880, 898–901 (1983). And unlike the determination of whether the death penalty is appropriate in a particular case, the competency determination depends substantially on expert analysis in a discipline fraught with "subtleties and nuances." *Addington, supra,* at 430. This combination of factors means that ordinary adversarial procedures—complete with live testimony, cross-examination, and oral argument by counsel—are not necessarily the best means of arriving at sound, consistent judgments as to a defendant's sanity. Cf. *Parham* v. *J. R.*, 442 U. S. 584, 609 (1979) ("Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real").

---

[6] Cf. *Addington* v. *Texas*, 441 U. S. 418 (1979). In *Addington,* the Court held that States must require proof by clear and convincing evidence in order to involuntarily commit an individual to a mental hospital for treatment. In this context, it is the defendant and not the State who seeks to overcome the presumption that he is sane; moreover, he does so following a trial and sentencing at which his sanity was either conceded or determined by the court.

We need not determine the precise limits that due process imposes in this area. In general, however, my view is that a constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied, and would apply the presumption of correctness of § 2254(d) on federal habeas corpus.

## IV

Because petitioner has raised a viable claim under the Eighth Amendment, and because that claim was not adjudicated fairly within the meaning of due process or of § 2254(d), petitioner is entitled to have his claim adjudicated by the District Court on federal habeas corpus. I therefore join the Court's judgment.

JUSTICE O'CONNOR, with whom JUSTICE WHITE joins, concurring in the result in part and dissenting in part.

I am in full agreement with JUSTICE REHNQUIST's conclusion that the Eighth Amendment does not create a substantive right not to be executed while insane. Accordingly, I do not join the Court's reasoning or opinion. Because, however, the conclusion is for me inescapable that Florida positive law has created a protected liberty interest in avoiding execution while incompetent, and because Florida does not provide even those minimal procedural protections required by due process in this area, I would vacate the judgment and remand to the Court of Appeals with directions that the case be returned to the Florida system so that a hearing can be held in a manner consistent with the requirements of the Due Process Clause. I cannot agree, however, that the federal

courts should have any role whatever in the substantive determination of a defendant's competency to be executed.

As we explained in *Hewitt* v. *Helms,* 459 U. S. 460, 466 (1983), "[l]iberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." See also *Meachum* v. *Fano,* 427 U. S. 215, 223–227 (1976). With JUSTICE REHNQUIST, I agree that the Due Process Clause does not independently create a protected interest in avoiding the execution of a death sentence during incompetency. See also *Solesbee* v. *Balkcom,* 339 U. S. 9 (1950). The relevant provision of the Florida statute, however, provides that the Governor "*shall*" have the prisoner committed to a "Department of Corrections mental health treatment facility" if the prisoner "does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him." Fla. Stat. § 922.07(3) (1985 and Supp. 1986). Our cases leave no doubt that where a statute indicates with "language of an unmistakable mandatory character," that state conduct injurious to an individual will not occur "absent specified substantive predicates," the statute creates an expectation protected by the Due Process Clause. *Hewitt* v. *Helms, supra,* at 471–472. See also *Vitek* v. *Jones,* 445 U. S. 480, 488–491 (1980); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 10 (1979) (entitlement created where under state law "there is [a] set of facts which, if shown, mandate a decision favorable to the individual"). That test is easily met here. Nor is it relevant that the statute creating the interest also specifies the procedures to be followed when the State seeks to deprive the individual of that interest. As we reaffirmed last Term, "[t]he categories of substance and procedure are distinct." *Cleveland Board of Education* v. *Loudermill,* 470 U. S. 532, 541 (1985). Thus, regardless of the procedures the State deems adequate for determining the preconditions to adverse official action, federal law defines the kind of proc-

ess a State must afford prior to depriving an individual of a protected liberty or property interest. *Id.*, at 541.

Although the state-created entitlement to avoid execution while insane unquestionably triggers the demands of the Due Process Clause, in my judgment those demands are minimal in this context. "It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation [requires].'" *Greenholtz* v. *Nebraska Penal Inmates, supra,* at 12, quoting *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). And there are any number of reasons for concluding that this "particular situation" warrants substantial caution before reading the Due Process Clause to mandate anything like the full panoply of trial-type procedures. The prisoner's interest in avoiding an erroneous determination is, of course, very great. But I consider it self-evident that once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly. *Meachum* v. *Fano, supra,* at 224. Moreover, the potential for false claims and deliberate delay in this context is obviously enormous. *Nobles* v. *Georgia,* 168 U. S. 398, 405–406 (1897). This potential is exacerbated by a unique feature of the prisoner's protected interest in suspending the execution of a death sentence during incompetency. By definition, this interest can *never* be conclusively and finally determined: Regardless of the number of prior adjudications of the issue, until the very moment of execution the prisoner can claim that he has become insane sometime after the previous determination to the contrary. Hazard & Louisell, Death, the State and the Insane: Stay of Execution, 9 UCLA L. Rev. 381, 399–400 (1962). These difficulties, together with the fact that the issue arises only after conviction and sentencing, convince me that the Due Process Clause imposes few requirements on the States in this context.

Even given the broad latitude I would leave to the States in this area, however, I believe that one aspect of the Florida

procedure for determining competency to be executed renders that procedure constitutionally deficient. If there is one "fundamental requisite" of due process, it is that an individual is entitled to an "opportunity to be heard." *Grannis* v. *Ordean*, 234 U. S. 385, 394 (1914). As currently implemented, the Florida procedure for determining competency violates this bedrock principle. By Executive Order, the present Governor has provided that "[c]ounsel for the inmate and the State Attorney may be present [at the competency hearing] but shall not participate in the examination in any adversarial manner." Exec. Order No. 83–137 (Dec. 9, 1983). See also *Goode* v. *Wainwright*, 448 So. 2d 999, 1001 (Fla. 1984) (describing the Governor's "publicly announced policy of excluding all advocacy on the part of the condemned from the process of determining whether a person under a sentence of death is insane"). Indeed, respondent does not dispute that the Governor's office has steadfastly refused to acknowledge whether it would even review the extensive psychiatric materials submitted by petitioner concerning his present mental state. While I would not invariably require oral advocacy or even cross-examination, due process at the very least requires that the decisionmaker consider the prisoner's written submissions.

I conclude therefore that Florida law has created a protected expectation that no execution will be carried out while the prisoner lacks the "mental capacity to understand the nature of the death penalty and why it was imposed on him." Fla. Stat. § 922.07(3) (1985). Because Florida's procedures are inadequate to satisfy even the minimal requirements of due process in this context, I would vacate the judgment below with instructions that the case be returned to Florida so that it might assess petitioner's competency in a manner that accords with the command of the Fourteenth Amendment. In my view, however, the only federal question presented in cases such as this is whether the State's positive law has created a liberty interest and whether its procedures

are adequate to protect that interest from arbitrary deprivation. Once satisfied that the procedures were adequate, a federal court has no authority to second-guess a State's substantive competency determination.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court today holds that the Eighth Amendment prohibits a State from carrying out a lawfully imposed sentence of death upon a person who is currently insane. This holding is based almost entirely on two unremarkable observations. First, the Court states that it "know[s] of virtually no authority condoning the execution of the insane at English common law." *Ante,* at 408. Second, it notes that "[t]oday, no State in the Union permits the execution of the insane." *Ibid.* Armed with these facts, and shielded by the claim that it is simply "keep[ing] faith with our common-law heritage," *ante,* at 401, the Court proceeds to cast aside settled precedent and to significantly alter both the common-law and current practice of not executing the insane. It manages this feat by carefully ignoring the fact that the Florida scheme it finds unconstitutional, in which the Governor is assigned the ultimate responsibility of deciding whether a condemned prisoner is currently insane, is fully consistent with the "common-law heritage" and current practice on which the Court purports to rely.

The Court places great weight on the "impressive historical credentials" of the common-law bar against executing a prisoner who has lost his sanity. *Ante,* at 406–408. What it fails to mention, however, is the equally important and unchallenged fact that at common law it was the *executive* who passed upon the sanity of the condemned. See 1 N. Walker, Crime and Insanity in England 194–203 (1968). So when the Court today creates a constitutional right to a determination of sanity outside of the executive branch, it does so not in keeping with but at the expense of "our common-law heritage."

In *Solesbee* v. *Balkcom*, 339 U. S. 9 (1950), a condemned prisoner claimed that he had a constitutional right to a judicial determination of his sanity. There, as here, the State did not approve the execution of insane persons and vested in the Governor the responsibility for determining, with the aid of experts, the sanity *vel non* of persons sentenced to death. In rejecting the prisoner's claim, this Court stated:

> "Postponement of execution because of insanity bears a close affinity not to trial for a crime but rather to reprieves of sentences in general. The power to reprieve has usually sprung from the same source as the power to pardon. Power of executive clemency in this country undoubtedly derived from the practice as it had existed in England. Such power has traditionally rested in governors or the President, although some of that power is often delegated to agencies such as pardon or parole boards. Seldom, if ever, has this power of executive clemency been subjected to review by the courts." *Id.*, at 11–12.

Despite references to "evolving standards of decency," *ante,* at 406, and "the jurisprudence of today," *ante,* at 409, the Court points to no change since *Solesbee* in the States' approach to determining the sanity of a condemned prisoner. Current statutes quite often provide that initiation of inquiry into and/or final determination of postsentencing insanity is a matter for the executive or the prisoner's custodian.* The Court's profession of "faith to our common-law heritage" and

---

*See Ariz. Rev. Stat. Ann. § 13–4021 (1978); Ark. Stat. Ann. § 43–2622 (1977); Cal. Penal Code Ann. § 3701 (West 1982); Conn. Gen. Stat. § 54–101 (1985); Ga. Code Ann. § 17–10–61 (1982); Kan. Stat. Ann. § 22–4006 (1981); Md. Ann. Code, Art. 27, § 75(c) (Supp. 1985); Mass. Gen Laws § 279:62 (1984); Miss. Code Ann. § 99–19–57 (Supp. 1985); Neb. Rev. Stat. § 29–2537 (1979); Nev. Rev. Stat. § 176.425 (1985); N. M. Stat. Ann. § 31–14–4 (1984); N. Y. Correc. Law § 655 (McKinney Supp. 1986); Ohio Rev. Code Ann. § 2949.28 (1982); Okla Stat., Tit. 22, § 1005 (1986); Utah Code Ann. § 77–19–13(1) (1982); Wyo. Stat. § 7–13–901 (Supp. 1986).

"evolving standards of decency" is thus at best a half-truth. It is Florida's scheme—which combines a prohibition against execution of the insane with executive-branch procedures for evaluating claims of insanity—that is more faithful to both traditional and modern practice. And no matter how long-standing and universal, laws providing that the State should not execute persons the executive finds insane are not themselves sufficient to create an Eighth Amendment right that sweeps away as inadequate the procedures for determining sanity crafted by those very laws.

Petitioner makes the alternative argument, not reached by the Court, that even if the Eighth Amendment does not prohibit execution of the insane, Florida's decision to bar such executions creates a right in condemned persons to trial-type procedures to determine sanity. Here, too, *Solesbee* is instructive:

> "Recently we have pointed out the necessary and inherent differences between trial procedures and post-conviction procedures such as sentencing. *Williams* v. *New York*, 337 U. S. 241. In that case we emphasized that certain trial procedure safeguards are not applicable to the process of sentencing. This principle applies even more forcefully to an effort to transplant every trial safeguard to a determination of sanity after conviction. As was pointed out in [*Nobles* v. *Georgia*, 168 U. S. 398 (1897)], to require judicial review every time a convicted defendant suggested insanity would make the possibility of carrying out a sentence depend upon 'fecundity in making suggestion after suggestion of insanity.' *Nobles* v. *Georgia, supra,* at 405–406. See also *Phyle* v. *Duffy*, [334 U. S. 431 (1948)]. To protect itself society must have power to try, convict, and execute sentences. Our legal system demands that this governmental duty be performed with scrupulous fairness to the accused. We cannot say that it offends due process to leave the question of a convicted person's sanity to the solemn respon-

sibility of a state's highest executive with authority to invoke the aid of the most skillful class of experts on the crucial questions involved." 339 U. S., at 12–13.

Even the sole dissenter in *Solesbee*, Justice Frankfurter, agreed that if the Constitution afforded condemned prisoners no substantive right not to be executed when insane, then the State would be free to place on the Governor the responsibility for determining sanity. *Id.*, at 15.

Petitioner argues that *Solesbee* is no longer controlling because it was decided "at a time when due process analysis still turned on the right-privilege distinction." Brief for Petitioner 8. But as petitioner concedes, his due process claim turns on a showing that the Florida statute at issue here created an individual right not to be executed while insane. Even a cursory reading of the statute reveals that the only right it creates in a condemned prisoner is to inform the Governor that the prisoner may be insane. Fla. Stat. § 922.07(1) (1985). The only legitimate expectation it creates is that "*[i]f the Governor decides* that the convicted person does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him, he shall have him committed to a Department of Corrections mental health treatment facility." § 922.07(3) (Supp. 1986) (emphasis added). Our recent cases in this area of the law may not be wholly consistent with one another. See *Olim* v. *Wakinekona*, 461 U. S. 238 (1983); *Hewitt* v. *Helms*, 459 U. S. 460 (1983); *Vitek* v. *Jones*, 445 U. S. 480 (1980); *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979); *Meachum* v. *Fano*, 427 U. S. 215 (1976). I do not think this state of the law requires the conclusion that Florida has granted petitioner the sort of entitlement that gives rise to the procedural protections for which he contends.

In any event, I see no reason to reject the *Solesbee* Court's conclusion that wholly executive procedures can satisfy due process in the context of a post-trial, postappeal, post-collateral-attack challenge to a State's effort to carry out

a lawfully imposed sentence. Creating a constitutional right to a judicial determination of sanity before that sentence may be carried out, whether through the Eighth Amendment or the Due Process Clause, needlessly complicates and postpones still further any finality in this area of the law. The defendant has already had a full trial on the issue of guilt, and a trial on the issue of penalty; the requirement of still a third adjudication offers an invitation to those who have nothing to lose by accepting it to advance entirely spurious claims of insanity. A claim of insanity may be made at any time before sentence and, once rejected, may be raised again; a prisoner found sane two days before execution might claim to have lost his sanity the next day, thus necessitating another judicial determination of his sanity and presumably another stay of his execution. See *Nobles* v. *Georgia,* 168 U. S. 398, 405–406 (1897).

Since no State sanctions execution of the insane, the real battle being fought in this case is over what procedures must accompany the inquiry into sanity. The Court reaches the result it does by examining the common law, creating a constitutional right that no State seeks to violate, and then concluding that the common-law procedures are inadequate to protect the newly created but common-law based right. I find it unnecessary to "constitutionalize" the already uniform view that the insane should not be executed, and inappropriate to "selectively incorporate" the common-law practice. I therefore dissent.