While I agree with the majority as to its disposition of Scott's first two assignments of error, I do so constrained by the language contained in R.C. 2949.28. The record clearly supports that Scott suffers from a severe form of mental illness. The record further supports that he does not meet the statute's definition of insanity, as currently defined, in that Scott appears to understand the nature of the death penalty and why it has been imposed upon him. What is less clear is which party bears the burden of proof and what threshold level of insanity must be demonstrated in order to constitute probable cause.
R.C. 2949.28(B) provides that one or more of several individuals shallgive notice of apparent insanity. This statutory provision reads:
 If a convict sentenced to death appears to be insane, the warden or the sheriff having custody of the convict, the convict's counsel, or a psychiatrist or psychologist who has examined the convict shall give notice of the apparent insanity * * *.
Upon receiving notice, the trial court judge then determines whether the record supports that probable cause exists to believe that the convict is insane. R.C. 2949.28(B)(2). If probable cause is found, the trial court then conducts a hearing in accordance with R.C. 2949.29 to determine whether the convict is insane. If no such finding is made, as was done in this case, then the matter is dismissed. Id.
The majority's conclusion as to the allocation of the burden of proof cannot stand under a plain reading of the R.C. 2949.28. While the statute's language is mandatory in that notice shall be given, it authorizes one of several individuals to give such notice. The statute is absolutely silent as to which party bears the burden proof. Merely because Scott was the party giving notice does not mean that he likewise has the burden of proof as to the contents of that notice. The notice as provided for in this statute is nothing more than a request for a judicial determination as to whether there exists probable cause to inquire into the sanity of a convict under a sentence of death. Giving notice, however, is not equivalent to filing a motion, the latter of which is associated with an attendant burden of proof. This court cannot transform an otherwise silent statute into one requiring Scott to carry the burden of proving that there exists probable cause that he is insane.[4]
The majority asserts, in particular, that the burden of proof is on Scott to demonstrate that there exists probable cause that he could prevail at an inquiry on the issue of insanity. This is putting the cart before the horse. While R.C. 2949.28(B)(1) speaks in terms of the appearance of insanity in giving notice, the statute later requires in subdivision (B)(2) that probable cause exist to believe that the convict is insane. Is the threshold issue one of the appearance of insanity or insanity itself that triggers an inquiry hearing under R.C. 2949.29? If it is insanity itself that must be shown, then why would it be necessary to proceed with the inquiry hearing at all? What is the difference between believing that a convict is insane and finding that same convict insane? If finding a convict to be insane requires a greater quantum of proof than believing that same convict to be insane, then there must be some threshold level less than the statute's present definition that would support a belief that a convict may be insane. To construe R.C.2949.28 otherwise renders the effect of the statute meaningless in light of the United States Supreme Court's decision in Ford v. Wainwright (1986), 477 U.S. 399.[5]
If I were to accept the absurdity that it must be shown that the convict is insane as defined in R.C. 2949.28(A) in order to find probable cause sufficient to hold an inquiry hearing to determine if the convict really is insane, then Scott could not prevail regardless of which party bears the burden of proof. As stated initially as well as by the majority, the record supports that Scott not only understands the nature of the death penalty but is aware of why it has been imposed upon him. This does not mean, however, that I believe the statute's definition of "insane" suffices under today's understanding of mental illness, in general, and schizophrenia, in particular.
It is in this regard that I find that I must respectfully but vigorously dissent from the majority's disposition of Scott's third assignment of error. In rejecting Scott's argument that evolving standards of decency militate against executing a severely mentally ill person such as himself, the majority focuses on Scott's cognitive ability to consciously understand that he is being executed because of his conviction for the murder of Vinney Prince. Because the record demonstrates that Scott understands why he is being executed, the majority asserts that any constitutional challenge must fail. I disagree.
As stated in Ford v. Wainwright, 477 U.S. at 411-412:
 Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding.
This is especially true because the possibility of death is involved. "In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." Id. at 410; see, also, State v. Scott (Apr. 17, 2001), Motion Docket Case No. 85-1209 (Pfeifer, J., concurring). As stated more recently by Justice O'Connor in California v. Ramos (1983),463 U.S. 992, 998-999, "[t]he Court * * * has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."
Nor should it have any bearing that Scott is now, at this late stage, seeking constitutional protection.
 This Court may not disregard the Constitution because an appeal in this case, as in others, has been made on the eve of execution. We must be deaf to all suggestions that a valid appeal to the Constitution, even by a guilty man, comes too late, because courts, including this Court, were not earlier able to enforce what the Constitution demands. The proponent before the Court is not the petitioner but the Constitution of the United States.
Chessman v. Teets (1957), 354 U.S. 156, 165.
In its Findings of Fact and Conclusions of Law, the trial court stated that Scott suffers from chronic, undifferentiated schizophrenia and that this disorder is a severe form of mental illness. It further stated that Scott has been diagnosed with this condition since 1994. The record on appeal is replete with evidence that the medical, psychological and scientific communities have greatly advanced their understanding of the nature, etiology and effects of schizophrenia since the United States Supreme Court decided Ford in 1986.
 The tremendous increase in knowledge gained by neuroscientists since 1985 has provided a much greater understanding of neural mechanisms of brain function and brain disorders than we could have anticipated. This progress has been due both to the increasing number of researchers and to unprecedented technological innovations. Most notable are the developments in molecular biology, genetics, computational capability, and noninvasive brain imaging. These new tools have given us new windows into the brain. As a result, neuroscience has become one of the most rapidly advancing scientific fields.
National Institute of Mental Health, United States Department of Health and Human Services, The Neuroscience of Mental Health II: A Report on Neuroscience Research — Status and Potential for Mental Health and Mental Illness, (1995) NIH Publication No. 95-4000.
These advances compel a re-examination of whether the standard elicited from Ford accurately reflects contemporary understanding of mental illness so as to effect the essential holding of Ford that it is unconstitutional to execute a person who is insane. An unquestioning reliance on the statutory definition of "insane" as meaning that the convict in question does not have the mental capacity to understand the nature of the death penalty and why it was imposed upon the convict, necessarily ignores these advances.[6]
A just application of the constitutional prohibitions against cruel and unusual punishment requires a synthesis of the growing understandingof mental illness as well as the history, precedents and tradition of constitutional interpretation. "Law must be stable and yet it cannot stand still." Pound, Interpretations of Legal History (1922) at 1. To stand still in the face of enhanced understandingof the human condition would subject this generation to the kind of judgment we now accord those who insisted that the earth was the center of the universe despite compelling evidence to the contrary. "We take a false and one-sided view of history when we ignore its dynamic aspects. The year books can teach us how a principle or a rule had its beginnings. They cannot teach us that what was the beginning shall also be the end." Cardozo, The Growth of the Law (1924), at 104-105.
Unlike the majority, I consider the granting of certiorari in McCarver as requiring that this court be open to at least the potential for a revised standard of interpretation of the definition of cruel and unusual punishment. That is, although McCarveris limited to "mental retardation" and Scott suffers from a form of "mental illness," both cases involve individuals whose "mental capacity"[7] is below the norm. At a minimum, the Supreme Court's review of McCarver could provide Scott's counsel an opportunity to invite that court to re-examine Ford, particularly in light of the enhanced understanding of schizophrenia and the undisputed nature and severity of Scott's mental illness.[8]
This case is not, therefore, merely one in which this court is obliged to apply existing law to facts as demonstrated in the record. Rather, the record confronts this court with the rare circumstance in which substantial developments in the understanding of the human condition require courts to re-examine established legal standards.
 [W]e come once more to a pervading problem of jurisprudence, the balance between stability and change. The controversy as to the type of law, whether custom or common law or tradition, on the one hand, or legislation, on the other, the controversy as to the relation of law to morals, the discussion as between adjudication and administration, as between law and equity, as between strict and free procedure, all run back to this problem of stability and change, and so to the fundamental one of a balance between the general security and the individual life.
Pound, The Formative Era of American Law (1938) at 18 (footnote deleted). "Jurisprudence has never been able in the long run to resist successfully a social or economic need that was strong and just." Cardozo, The Growth of the Law (1924), at 117-118.
Stability would recommend literal application of the narrow, statutory definition of "insane" as the only circumstance in which imposition of the death penalty on a person with chronic undifferentiated schizophrenia would constitute cruel and unusual punishment. Change, however, would require, at a minimum, that courts have the benefit of contemporary insights into such a severe form of mental illness. If we are to discharge our adjudicatory mission, we must engage the essential question of jurisprudence: does experience require that the law change? I think so.
As Justice Cardozo stated in The Nature of the Judicial Process (1921) at page 163:
 In what I have said, I have thrown, perhaps too much, into the background and the shadow the cases where the controversy turns not upon the rule of law, but upon its application to the facts. Those cases, after all, make up the bulk of the business of the courts. They are important for the litigants concerned in them.
 They call for intelligence and patience and reasonable discernment on the part of the judges who must decide them. But they leave jurisprudence where it stood before. As applied to such cases, the judicial process, * * * is a process of search and comparison, and little else. We have to distinguish between the precedents which are merely static, and those which are dynamic.
* * *
 [T]here remains a percentage, not large indeed, and yet not so small as to be negligible, where a decision one way or the other, will count for the future, will advance or retard, sometimes much, sometimes little, the development of the law. These are the cases where the creative element in the judicial process finds its opportunity and power. * * * In a sense it is true of many of them that they might be decided either way. By that I mean that reasons plausible and fairly persuasive might be found for one conclusion as for another. Here come into play that balancing of judgment, that testing and sorting of considerations of analogy and logic and utility and fairness * * *.
The existing restrictive definition of "insane" ignores the experience of the medical, psychological and scientific communities as well as the common-sense experience of every day life. The general security is protected by Scott's continued incarceration. Executing a person with the degree of degenerative mental illness demonstrated by this record would diminish this society and skew the balance between the general security and the individual life.
Consequently, I would conclude that the standard elicited from Ford regarding the definition of "insane" is not consistent with the prohibition against inflicting cruel and unusual punishment.
Accordingly, I would hold that the imposition of the death penalty constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution and Section 9, Article I, Ohio Constitution, and would remand for re-sentencing. At a minimum, I would request that the Ohio Supreme Court stay the execution of judgment in this case until Scott's counsel has the opportunity to seek review from the United States Supreme Court regarding the viability of the standard set forth in Ford.
[4] Nor can it be inferred that the presumption of sanity that attaches at the inquiry stage under R.C. 2949.29(C) is similarly applicable at the probable cause stage. Had the legislature intended it to be so, it would have included that language or any corresponding reference to that language in R.C. 2949.28.
[5] I am not faulting the majority for its interpretation in this regard because I believe the statute itself is not clear in its directions to the trial court. R.C. 2949.28 et seq. appears to be internally inconsistent as if it were drafted in haste, although there is a twelve year interval between its effective date and the United States Supreme Court's 1986 decision in Ford. If nothing else, the medical community's understanding of mental illness has undergone a significant if not dramatic metamorphosis since 1986.
[6] Even the United Nations Commission on Human Rights has taken the position that a mentally ill person should not be executed. United Nations Economic and Social Council, Commission on Human Rights (Apr. 27, 2000), E/CN.4/RES/2000/65.
[7] The term is used both in R.C. 2949.28(A) and the Florida statute reviewed in Ford.
[8] Documentary evidence before the trial court depicts the steady but expansive growth in research in the area of schizophrenia as well as the knowledge spawned from that research. Given the time constraints under which this court had to review the record, research the issues and prepare an opinion, it is not possible to give justice to the medical and scientific communities' advances in this area. It is the hope of this author that another reviewing court have the opportunity to give this issue the time and attention it deserves.