NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2510
_____

ANDY RIVERA-RODRIGUEZ,
                                        Appellant
v.

THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA;
SUPERINTENDENT GRATERFORD SCI;
THE DISTRICT ATTORNEY OF LANCASTER COUNTY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 5-13-cv-04299)
District Judge: Honorable James Knoll Gardner
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 10, 2017

Before: HARDIMAN and KRAUSE, *Circuit Judges*, and STENGEL, *District Judge*.[*]

(Filed: March 28, 2017)
_____

OPINION[**]
_____

_____

[*] The Honorable Lawrence F. Stengel, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

HARDIMAN, *Circuit Judge*.

Andy Rivera-Rodriguez appeals an order of the District Court denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Because Rivera-Rodriguez has not satisfied his onerous burden under the Antiterrorism and Effective Death Penalty Act (AEDPA), we will affirm.

I

On the evening of January 17, 2004, Rivera-Rodriguez was a passenger in a vehicle owned by Ryan Gardina and operated by Esteban Torres-Sanchez. Police stopped the vehicle for driving without lights and took Torres-Sanchez into custody. Gardina was not in the vehicle when it was stopped and he was reported missing the next day by his family. The day Gardina was reported missing, a police detective went to Rivera-Rodriguez's home, but he wasn't found there, so the detective left word that he would like to speak with Rivera-Rodriguez about Gardina's whereabouts. Later that evening, a few hours after Gardina's dead body was found near Torres-Sanchez's home, Rivera-Rodriguez voluntarily went to the police station. After receiving multiple *Miranda* warnings, Rivera-Rodriguez confessed to helping Torres-Sanchez murder Gardina. Rivera-Rodriguez was charged accordingly with, among other things, criminal homicide and robbery. The Commonwealth sought the death penalty.

Prior to the events of January 2004, Rivera-Rodriguez had a history of intellectual disability diagnoses. Multiple psychologists and doctors assessed him during his youth as

2

suffering from moderate mental retardation, along with other intellectual disabilities. Following arrests as a young man, Rivera-Rodriguez was twice committed to Pennsylvania Secure Treatment Units, where mental health evaluations confirmed his disability.

Aware of Rivera-Rodriguez's disability, counsel filed a motion to suppress his confession alleging, *inter alia*, that his client's waiver of *Miranda* rights could not have been knowing, intelligent, or voluntary. Counsel retained two experts to support his argument: Dr. Dixon Miller and Dr. Jerome Gottlieb. Dr. Miller testified in the suppression hearing as to Rivera-Rodriguez's intellectual disabilities, including his evaluation that Rivera-Rodriguez had an IQ of about 58. The Commonwealth in turn provided testimony that: (1) Rivera-Rodriguez's interviews with police evidenced an understanding of the right to remain silent, and (2) Rivera-Rodriguez's prior encounters with the criminal justice system showed an ability to understand *Miranda* warnings generally. The trial court found that Rivera-Rodriguez "had sufficient mental capacity to understand and waive his *Miranda* rights" and denied the motion to suppress. App. 810–11.

After the motion to suppress was denied, Rivera-Rodriguez's counsel struck a deal with the Commonwealth to take the death penalty off the table in exchange for Rivera-Rodriguez's waiver of his right to a jury trial. The judge found Rivera-Rodriguez guilty and sentenced him to life in prison. The sentence was upheld on appeal.

3

Rivera-Rodriguez sought relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. § 9543. He argued that trial counsel was ineffective for waiving his right to a jury trial because he was ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). At a hearing, Rivera-Rodriguez's trial counsel testified that he was aware of both *Atkins* and his client's intellectual disabilities and IQ tests. App. 797. But counsel also noted that Dr. Gottlieb mentioned—consistent with at least one other medical record—that Rivera-Rodriguez "appeared to be functioning at a higher IQ level than he tests." App. 799. Additionally, counsel testified that the Commonwealth was prepared to submit evidence that Rivera-Rodriguez was capable of normal functioning, including: employment and relationship history, testimony from friends that he "appeared normal," and evidence that he planned this offense and others. *Id.* In view of the "fairly nebulous definition" of adaptive functioning at the time, counsel decided it was uncertain whether a judge or jury would find Rivera-Rodriguez ineligible for the death penalty. *Id.* The PCRA court denied relief, and its decision was affirmed on appeal.

Rivera-Rodriguez subsequently filed an untimely federal habeas petition again asserting ineffective assistance of counsel.[1] The District Court granted equitable tolling of the petition, finding that Rivera-Rodriguez's mental disability prevented him from

---

[1] Rivera-Rodriguez asserted a number of other claims not preserved for this appeal, including that the trial court erred in not suppressing his confession under *Miranda v. Arizona*, 384 U.S. 436 (1966).

understanding the nature of a deadline. The District Court denied his claim on the merits, however, holding that the state court did not err when it found that counsel was not deficient in bargaining, as evidence existed that Rivera-Rodriguez possessed some adaptive skills and the definition of "mental retardation" under *Atkins* was a "legal uncertainty." *Rivera-Rodriguez v. Superintendent Wenerowicz S.C.I. Graterford*, 2016 WL 1592949, at *3 n.3 (E.D. Pa. Apr. 21, 2016). The District Court granted a certificate of appealability on "his claim of ineffectiveness of counsel as to the waiver of his right to a jury trial." *Id.* at *3. This appeal followed.

## II[2]

We review the District Court's findings of fact for clear error and its conclusions of law de novo. *Love v. Morton*, 112 F.3d 131, 133 (3d Cir. 1997). Under AEDPA, we may reverse the state court judgment only if it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 384 (2000).

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

## III

To prevail on an ineffective assistance of counsel claim, a defendant must show deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to the first *Strickland* prong, Rivera-Rodriguez must convince us of two propositions. First, no reasonable factfinder could have found him death-eligible under *Atkins*. Second, counsel would have known this to be true with either a better understanding of the law or a more thorough investigation of Rivera-Rodriguez's case. His appeal fails in both respects.

The Supreme Court in *Atkins* barred the execution of the intellectually disabled, but did not provide the States with a bright-line rule for determining intellectual disability. *Atkins*, 536 U.S. at 317. Rather, the Court chose to "leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction." *Id.* (alteration in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416 (1986)). While the Court noted that those with an IQ below 70 generally suffer from what the Court described as "mental retardation," *id.* at 308 n.3, it also noted that the clinical definition "require[d] not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction," *id.* at 318. As Rivera-Rodriguez acknowledges, Pennsylvania courts had not elaborated on the *Atkins* standard by the time of his trial. Because they had failed to do so, it was unclear whether Rivera-Rodriguez was eligible for the death penalty based on his IQ alone.

6

Rivera-Rodriguez acknowledges that "IQ scores alone" would not have triggered *Atkins* protection, Rivera-Rodriguez Br. 29, but argues that greater investigation into his adaptive deficits would have demonstrated he was not death eligible. He places significant emphasis on his trial counsel's testimony at the PCRA hearing that counsel did not "go into adaptive functioning with [his retained experts] to a large degree," App. 797. Nevertheless, counsel remained concerned that "general facts, not necessarily expert opinions" would also sway the jury's determination—namely, that the Commonwealth's evidence of some adaptive skills made the *Atkins* determination uncertain. *Id.*

Rivera-Rodriguez's appellate counsel diligently marshals medical and legal resources to show flaws in the Commonwealth's evidence rebutting Rivera-Rodriguez's intellectual disability. But whether that evidence appears persuasive today is beside the point for this ineffective assistance claim. Counsel for Rivera-Rodriguez knew that the Commonwealth would produce evidence rebutting the notion that his client was disabled within the meaning of *Atkins* and reasonably inferred there was at least a chance that the death penalty could be imposed. Under our deferential standard of review, we cannot say that the state court erred when it held that "counsel had a strategic basis for his advice." App. 854.

\*       \*       \*

We will affirm the District Court's judgment for the reasons stated.