

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## NO. AP-77,055

---

**RANDALL WAYNE MAYS, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON REVIEW OF AN ARTICLE 46.05 COMPETENCY TO BE EXECUTED
### HEARING FROM CAUSE NO. B-15,717
### IN THE 392ND DISTRICT COURT
### HENDERSON COUNTY

---

**KEASLER, J., delivered the unanimous opinion of the Court.**

### O P I N I O N

In 2008, Mays was convicted of capital murder and sentenced to death. His execution

was set for March 18, 2015. In February 2015, Mays filed a motion in the trial court

challenging his competency to be executed.[1] The trial judge denied Mays's motion, finding

---

[1] *See* TEX. CODE CRIM. PROC. art. 46.05(a) ("A person who is incompetent to be executed may not be executed."). Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

that Mays had failed to make a threshold showing raising a substantial doubt of his competency to be executed.[2] Mays appealed the trial judge's ruling to this Court. We determined that further review was necessary, and we stayed Mays's execution. In December 2015, we held that Mays "did make a substantial showing that he is incompetent to be executed."[3] We set aside the trial judge's order denying relief, and we remanded this cause to the trial court for further competency proceedings, including the appointment of mental health experts.[4]

After an evidentiary hearing was held in August 2017, the trial judge found that Mays is competent to be executed. Again, Mays has appealed the trial judge's decision to this Court. We affirm the trial judge's decision finding Mays competent to be executed, and therefore lift the stay of execution.

## I. BACKGROUND

Mays committed the capital murder of Henderson County Deputy Sheriff Tony Ogburn during a stand-off with police at Mays's residence. On the afternoon of May 17, 2007, Mays's neighbor called 911 to report that Mays was shooting a handgun at his wife. When officers responded to the dispatch call, Mays initially displayed a calm demeanor. He

---

[2] *See* Art. 46.05(d) ("On receipt of a motion filed under [Article 46.05], the trial court shall determine whether the defendant has raised a substantial doubt of the defendant's competency to be executed[.]").

[3] *Mays v. State,* 476 S.W.3d 454, 456 (Tex. Crim. App. 2015).

[4] *Id.* at 462.

explained that he had been "target practicing" and that his gun was inside his house. However, when Mays realized he was going to be arrested, he pulled out a knife and ran in the front door of his house. He emerged with a rifle, warned the officers to "back off," then went back inside his house. Deputy Billy Jack Valentine tried to persuade Mays to put down the rifle and come outside. Other officers, including Deputy Ogburn, took turns talking to Mays. During the stand-off, Mays remarked that he feared the officers would kill him. He expressed confusion about why he was "the bad guy." And he commented that he was "sick" and "about to die" because he "was poisoned."

Mays eventually climbed out of a window without his rifle. As another deputy talked to Mays in an effort to keep him calm, Valentine tried to position himself between Mays and the window. When Mays saw what Valentine was doing, he re-entered his house by diving head-first through the window. Mays then fired his rifle from inside his house, striking Deputy Ogburn in the head and killing him. Mays yelled, "Where's the other one? I'll take him out, where is he?" He then killed Inspector Paul Habelt by shooting him in the head. The surviving officers returned gunfire, and Mays shot Deputy Kevin Harris in the leg. Mays was eventually wounded, and he surrendered. He later told news reporters that he killed the officers because he "felt [he] was being mistreated."

Although Mays did not raise an insanity defense at trial, he presented evidence of his mental condition. Dr. Theresa Vail, who was Mays's treating psychiatrist at the Smith County Jail, testified that Mays had depression and "a psychotic disorder not otherwise

specified." Psychologist Gilda Kessner and psychiatrist David Self did not examine Mays but gave their opinions of his mental condition. Kessner opined that Mays suffered from a "thought disorder with paranoid ideation." Self opined that Mays had a "chronic and severe psychiatric illness" and agreed that his past methamphetamine use might have contributed to his psychosis. Mays's friends and family members acknowledged his prior drug use, but generally described him as gentle and even-tempered. However, Mays's sister testified that he sometimes acted suspicious and distrustful, and his mother testified that she had occasionally seen Mays with a "weird look" in his eyes.

On direct appeal to this Court, Mays raised a number of issues related to his mental health. He asserted that it is unconstitutional to execute the mentally ill. He complained that the trial judge erroneously instructed the jury that it could not consider mental-illness evidence that he "lacked the capacity to act intentionally or knowingly" during the commission of the offense. He also argued that, due to his psychotic paranoia at the time of the crime, he was entitled to jury instructions on mistake of fact, justification defenses, and the lesser-included offenses of manslaughter and criminally negligent homicide. This Court rejected those claims and affirmed Mays's capital murder conviction and death sentence on direct appeal.[5]

Mays next filed an Article 11.071 application for a writ of habeas corpus in the trial court. Mays asserted on habeas that it is unconstitutional to execute the mentally ill. He

---

[5] *Mays v. State,* 318 S.W.3d 368 (Tex. Crim. App. 2010).

argued that trial counsel were ineffective because they failed to pursue a neuropsychological evaluation for organic brain damage. He further alleged that trial counsel were ineffective because they failed to request a hearing on whether he was competent to stand trial and failed to raise an insanity defense. Trial counsel testified at the habeas hearing that they did not think that an insanity or incompetency argument would have been successful. Counsel believed that Mays understood the proceedings against him. With regard to their preparation of Mays's case, counsel explained that Mays was helpful at times, but suspicious and disagreeable at other times. Counsel did not pursue a competency evaluation because they were concerned that the State would conduct their own evaluation and use the results to the detriment of the defense. When trial counsel attempted to have a psychologist evaluate Mays for organic brain damage, Mays refused to cooperate.

Mays, however, agreed to cooperate when state habeas counsel hired Dr. Joan Mayfield to conduct a neuropsychological evaluation on October 9, 2009. Although Mayfield testified at the habeas hearing that Mays was "cooperative," she added that his attention was "variable" and he was "[p]retty withdrawn." She reported that Mays was "sometimes hesitant to talk about his history." Mayfield gave Mays a battery of tests, which indicated some deficits in his cognitive functioning. Mayfield diagnosed him with "dementia not otherwise specified" caused by chronic drug abuse. Mayfield testified that it was not "like an Alzheimer's dementia." She explained that, "[o]nce the drug is stopped, there is still damage; but it would not be progressive."

Following the habeas hearing, the trial judge recommended that relief be denied. This Court adopted the trial judge's findings and conclusions and denied habeas relief.[6]

Mays again raised these claims when he filed a petition for a writ of habeas corpus in federal court. The United States District Court for the Eastern District of Texas denied relief.[7] The Fifth Circuit denied Mays's request for a certificate of appealability.[8] The United States Supreme Court denied Mays's petition for writ of certiorari.[9]

Mays's execution was initially set for March 18, 2015. In February 2015, the Office of Capital and Forensic Writs (OCFW) filed in the trial court an Article 46.05 motion challenging Mays's competency to be executed. On February 27, 2015, the trial judge issued an order in which he found that Mays had failed to make a threshold showing raising a substantial doubt of his competency to be executed, and he declined to appoint experts to evaluate Mays. Mays then asked this Court to review the trial judge's denial of his Article 46.05 motion. We first determined that further review was necessary and stayed Mays's execution. On December 16, 2015, we concluded that Mays had made a substantial showing

---

[6] *Ex parte Mays*, No. WR-75,105-01, 2011 WL 1196799, at *1 (Tex. Crim. App. Mar. 16, 2011) (*per curiam*, not designated for publication).

[7] *Mays v. Director, TDCJ-CID*, No. 6:11-CV-135, 2013 WL 6677373 (E.D. Tex. Dec. 18, 2013) (mem. op., not designated for publication).

[8] *Mays v. Stephens*, 757 F.3d 211 (5th Cir. 2014).

[9] *Mays v. Stephens*, 135 S. Ct. 951 (2015).

that he is currently incompetent to be executed.[10] We held that Mays was entitled to further proceedings in accordance with Article 46.05, including the appointment of at least two mental health experts and a determination on the merits of his claim of incompetency.[11]

The trial judge thereafter appointed three experts to evaluate Mays for execution competency. An evidentiary hearing to determine execution competency was held in August 2017. On October 2, 2017, the trial judge issued an order concluding that Mays had failed to prove by a preponderance of the evidence that he is incompetent to be executed. Mays now appeals the trial judge's decision to this Court.

## II. ARTICLE 46.05 PROCEDURE

Article 46.05 prohibits the execution of a person who is incompetent.[12] A prisoner is incompetent to be executed if he does not understand: (1) that he is to be executed and that the execution is imminent; and (2) the reason he is being executed.[13]

Article 46.05 provides a two-stage procedure by which a prisoner can prove that he is incompetent to be executed. First, the prisoner has a threshold burden to make a substantial showing of execution incompetency.[14] Once this threshold burden has been

---

[10] *Mays*, 476 S.W.3d at 462.

[11] *Id.*

[12] *See* Art. 46.05(a); *see also Ford v. Wainwright*, 477 U.S. 399, 409–10 (1986).

[13] Art. 46.05(h).

[14] *Mays*, 476 S.W.3d at 457; *see also* Art. 46.05(f).

satisfied, the prisoner is entitled to further proceedings under Article 46.05.[15] The second stage is a final, adversarial hearing at which the prisoner has to prove by a preponderance of the evidence that he is incompetent to be executed.[16] At the hearing, the fact finder must consider competing credible evidence of competency and resolve the ultimate issue of whether or not the prisoner is competent to be executed.[17]

In order to meet his threshold burden in this case, Mays relied upon Mayfield's 2009 evaluation and the trial testimony of Vail, Kessner, and Self. He also produced medical records showing his past and present delusional and paranoid behavior. His evidence showed that he had been placed in the Terrell State Hospital twice in the 1980s due to psychotic behavior. His second stay at Terrell occurred after police officers found him "spaced out on crystal [methamphetamine]" and experiencing auditory hallucinations.

When Mays was hospitalized in 2007 to receive treatment for the gunshot wound he sustained in the instant offense, he again experienced paranoia and hallucinations. After he was transported from the hospital to the Smith County Jail, he expressed paranoid thoughts that: he was being poisoned; prisoners and guards were plotting to harm him; he was allergic to ozone; and gases in the air were affecting his ability to breathe. His medical records from the Smith County Jail in 2007 noted "organic brain syndrome" and prescriptions for Zoloft,

---

[15] *Mays*, 476 S.W.3d at 457.

[16] *Id.* at 458; *see also* Art. 46.05(k).

[17] *Mays,* 476 S.W.3d at 458.

an anti-depressant, and Risperdal, an anti-psychotic medication. While incarcerated, he wrote letters to his sister about investing in a renewable energy program and building a windmill tower.

When Mays met with attorney Katherine Black in February 2015, he told her that he heard the voices of "evil spirits" and complained about ozone and carbon monoxide in his cell. Psychologists James Underhill and Cecil Reynolds, who reviewed Mays's records, signed affidavits in which they expressed doubts about his competency to be executed.

We determined based on this evidence that Mays met his threshold burden to make a substantial showing of execution incompetency.[18] We therefore concluded that Mays was entitled to further proceedings under Article 46.05, including the appointment of mental health experts and a determination on the merits of his competency to be executed.[19]

### III.  THE EVIDENTIARY HEARING TO DETERMINE COMPETENCY

The trial judge held a four-day competency hearing in August 2017. Prior to the hearing, the trial judge appointed three mental health experts to evaluate Mays for execution competency: Bhushan S. Agharkar (who was selected from Mays's list of proposed experts); J. Randall Price (who was selected from the State's list of proposed experts); and George Woods (who was jointly proposed by Agharkar and Price). The trial judge also signed an "Agreed Order on Preliminary Article 46.05 Proceedings" instructing the experts to answer

---

[18]  *Mays*, 476 S.W.3d at 462.

[19]  *Id.*; *see also* Art. 46.05(k).

the following "Referral Questions":

1.  Does Mr. Mays suffer from a mental illness or mental impairment?

2.  If so, does Mr. Mays's mental illness or mental impairment deprive him of a rational understanding of the connection between his crime and his punishment, i.e., "if [Mr. Mays's] mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole?" *Panetti v. Quarterman,* 551 U.S. 930, 958-59 (2007).

The order further instructed the experts to consider whether Mays's mental illness or impairment deprives him of: (1) a rational understanding that he is to be executed and that the execution is imminent or (2) a rational understanding of the reason he is being executed.[20]

An exhibit was attached to the order which contained professional guidelines and an evaluation checklist that were published in the *Behavioral Sciences & the Law* journal in 2003.[21] Mays acknowledges in his brief that the guidelines and checklist were provided to the experts "at the suggestion of Mays's counsel." The trial judge ordered the experts to use Sections I, II, and III of the checklist "to assist [them] in conducting their evaluations and as the basis for framing the conclusions that shall be set forth in their written reports." Sections I and II contained factors to consider when evaluating an inmate's understanding of his punishment and the reasons for it. Section III contained factors to consider when evaluating

---

[20] *See* Art. 46.05(h).

[21] Patricia A. Zapf, Ph.D., Marcus T. Boccaccini, M. A. & Stanley L. Brodsky, Ph.D., *Assessment of Competency for Execution: Professional Guidelines and an Evaluation Checklist*, BEHAV. SCI. LAW 21:103–120 (2003).

an inmate's ability to "appreciate and reason in addition to simple factual understanding." All of the experts testified at the hearing and submitted reports that were admitted into evidence.

### A. Mental Health Experts

Agharkar, a psychiatrist in private practice, was the first of the three experts to evaluate Mays. He reviewed Mays's records and conducted a face-to-face clinical interview with him at the Polunsky Unit. Agharkar testified that, although he utilized the checklist provided by the trial judge, he did not ask Mays every question contained within it. He did not think it was "a good idea clinically" or "useful forensically" to ask closed-ended questions. He believed that it was "a more effective interviewing style and technique" for the interviewer to ask "open-ended questions" and then follow up for clarification purposes. Agharkar also expressed that it is difficult to build rapport when "you hit somebody with a barrage of questions or you just go down a list." He further noted that the "guidelines" provided by the trial judge had been peer-reviewed but not validated.

Agharkar met with Mays for two hours on June 16, 2016, and again for one and a half hours on August 18, 2016. Agharkar described Mays's demeanor as guarded and paranoid. Agharkar reported that Mays expressed "a great deal of fear regarding being poisoned both by the environment but also by the guards." Mays believed that his food was being poisoned, that "pepper gas" was being pumped through the vents in his cell, and that "ozone in the atmosphere" was making him tired and unable to think clearly. Mays complained of arm

pain, headaches, and stomachaches. He reported that he had been hearing the voice of God speaking directly to him since he was an infant. He said that he did not take medication given to him in prison because it made him hallucinate. When Mays noticed during the interview that some numbers were printed on Agharkar's shirt, he thought they represented "some hidden message or code that [Agharkar] was not sharing with him."

Mays told Agharkar that he had been awarded a patent on his design for an invention, which he described as a "renewable energy source" that would be delivered "directly to consumers" and "would essentially put the big gas or electric companies out of business." Mays stated that the prison warden was being pressured by the power companies to execute him because they would lose "billions of dollars" if his idea came to fruition. He also believed that the State wanted to execute him to save money on his medical expenses.

Agharkar acknowledged that when Mays had been in Terrell State Hospital in the 1980s, the doctors thought that his hallucinations and paranoia were related to his methamphetamine abuse. But he noted that Mays continued to have psychotic symptoms years after he stopped taking drugs. He testified that methamphetamine abuse typically does not cause "persisting" psychotic symptoms. He testified that the fact that Mays had consistent delusions over time "without any substance being involved" indicated that Mays's condition was "not related to substance illness and it's most likely to be a primary psychotic condition like schizophrenia[.]"

Agharkar testified that he conducted "screenings" of Mays "to detect for the presence

of brain damage." He acknowledged that he did not perform a "neuropsychological battery" and that he "would never diagnose someone based on [his] screenings." However, Agharkar noted that his basic screening results were consistent with Mayfield's diagnosis of dementia in Mays in 2009. Agharkar acknowledged that people with dementia eventually lose the ability to do "activities of daily living," also called "ADLs." When asked if there was any evidence of Mays "losing his ADLs," Agharkar replied, "Not that I'm aware." But Agharkar explained that ADLs are "hard to assess" in a prison setting.

Agharkar explained that Mays's thoughts were "tangential" and not linear or logical, which is "a sign of brain damage and brain impairment." He described Mays as "perseverative" because he repeated the same responses and could not easily move from one topic to the next. Agharkar testified that this was indicative of both brain damage and mental illness. Agharkar further noted that when he returned to Polunsky for their second meeting, Mays remembered Agharkar's name and occupation, but he could not remember why Agharkar was there. Agharkar testified that this was consistent "with a memory impairment such as dementia."

Agharkar stated in his report that Mays evaded some questions about his symptoms and legal circumstances because he wanted to avoid dwelling on "negative things." When Agharkar asked Mays directly about his psychotic symptoms, Mays minimized the symptoms and tried to act as if "it wasn't a big deal." Mays became more agitated and paranoid during their second meeting when Agharkar "challenged him on a number of things" and "really

tried to explore his thinking."  Agharkar testified that their second meeting did not end well because Mays became suspicious of Agharkar's motives and accused him of trying to "put words into his mouth" or "psych him out somehow."

Agharkar opined that Mays has both schizophrenia and neurocognitive disorder (also called dementia).  Agharkar acknowledged that, at the time of his evaluation, Mays was not being treated for either of these conditions.  He further acknowledged that neither Vail nor Mayfield found Mays to have schizophrenia.  He stated in his report that "[t]he combination of a psychotic condition in addition to a dementing cognitive process is worse than either alone for Mr. Mays."  He did not think that Mays was malingering.

Agharkar concluded that Mays is not competent to be executed.  Although Mays understands that he is to be executed and that his execution is imminent, Agharkar concluded that he does not have a rational understanding of the reason he is being executed.  Agharkar stated in his report that Mays's "beliefs about why he is to be executed are rooted in delusional thinking, the product of a severe psychotic mental illness and a damaged brain." He added that Mays's significant brain damage "makes it extremely unlikely that [he] will ever rationally understand why he is to be executed as this condition exacerbates his paranoia and severely hampers his ability to rationally consider his present situation."

The next expert to evaluate Mays was Price, a forensic psychologist and neuropsychologist.  In addition to reviewing his legal and medical records, Price conducted a two-hour face-to-face clinical interview with Mays at the Polunsky Unit on September 13,

2016. Unlike Agharkar, Price believed that it was the "best practice" to use checklists in evaluations. Price utilized the checklist provided by the trial judge, but he did not mechanically follow it, and he felt he had discretion to skip some of the questions. Although not mandated by the trial judge, he also utilized Section IV of the trial judge's checklist, which pertained to Mays's "ability to assist [his] attorney," because he thought it might be important. In addition, Price used his own checklist of 104 questions, which he called "The Structured Competency for Execution Interview." He described this in his report as "a focused inquiry consist[ing] of a series of questions to guide the evaluator in the evaluation of his competency for execution as set forth in *Panetti* . . . and in Article 46.05 of the Texas Code of Criminal Procedure."

Prior to interviewing Mays, Price explained the purpose of the evaluation and the procedures involved. Mays said he understood the information and agreed to the evaluation. However, Mays refused to sign an informed consent form, reportedly on the advice of his attorney. Price described Mays as "very friendly and polite," but noted that "his cooperativeness deteriorated over the evaluation especially when testing was attempted."

Mays told Price that he had completed ninth grade and his work history included work as a "roughneck and mechanic in . . . oil fields" and a "handyman." He acknowledged that he had been sent to Terrell in the 1980s due to methamphetamine use. He described that time period as a "crazy part of [his] life." He also stated that he had been dishonorably discharged from the Army when he "[w]ent AWOL after a Sergeant hit him with a stick because he did

not keep his head down on the firing line."

Price stated in his report that "[n]o psychotic thinking was evident" during his evaluation of Mays. However, "[d]elusions were evident, including paranoid ideation concerning air quality, food contaminants, somatic processes, and the legal system." Mays complained of elbow, shoulder, and back pain. He stated that his liver hurt when he ate sugar, salt, and vanilla. He also reported difficulty breathing in a confined area "due to ozone coming in through the ventilation" in the prison. With regard to his mental state, Mays said, "I'm pretty messed up at times."

According to Price, Mays enjoyed talking about "the environment and energy alternatives." He told Price that he studied ecology and fossil fuels because he "was interested in it" and he "thought everybody should be interested in it." However, he did not tell Price that he had a patent or an invention or that he wanted to run a business from death row. Nor did he tell Price that he was going to be executed for such reasons. Price testified: "[Mays] said that he wanted to help people, his friends and family, to build things that were environmentally friendly, and he thought he could help them from prison by correspondence[.]" Price thought that Mays "sounded rational about these issues during this evaluation."

Price stated in his report that Mays was extremely reluctant to give detailed answers to questions about his offense or legal situation. He told Price that his attorney told him not to answer any questions about the offense. Mays said he was in prison because "[t]hey say

I murdered two police officers." He knew he had been convicted of capital murder, which he defined as "similar to murder but like when more than one person's life is taken." He said that one victim's name was "Harris," but he "would rather not" name the other victims. Mays "readily expressed his anger and frustration over his offense and conviction." He said that his conviction was "totally unfair," and the offense would not have happened if the police had "not come on [his] property and point[ed] their guns at [him]." He expressed a belief that he could get out of prison someday because "the Lord works miracles." He also thought that he could get out of prison based on "appeals and getting his case overturned." Price testified that it was reasonable and rational for an inmate in Mays's circumstances to have such beliefs.

Price observed that Mays "seemed extremely anxious about his current legal situation and the possibility that he will be executed." Mays "appeared worried and distressed when asked to discuss his punishment," and he "evidenced somatic symptoms including shaking, difficulty breathing, and dryness of mouth." He "refused to answer any questions about the death penalty because it was unpleasant for him," and he avoided saying the words "death," "death penalty," and "death sentence." When Price asked Mays if his sentence was death or life without parole, he responded that "the Bible says the devil is trying to kill me." When Price asked Mays to clarify that answer, he said, "It's the word of God." When Price asked him what it meant to receive a death sentence, he responded "only the Lord knows." Mays avoided or resisted answering more questions about his death sentence and execution,

repeatedly stating that he did not want to "dwell on the past" or "dwell on negative things."

Price administered the Montreal Cognitive Assessment (MoCA) to Mays, which he described as a standardized mental status examination of cognitive functioning. Price reported that Mays's score on the MoCA placed him in the "mild cognitive impairment range." Mays's results "did not reveal deficits in visuospatial, executive, language, attention, abstraction, or orientation." Price stated that "[t]he only deficit revealed was in memory, specifically in delayed recall for unrelated words." Price also administered the Rey Fifteen Item Test (RFIT) to Mays, which he described as a screening test for malingering of impaired cognitive abilities. Mays's performance on this test was not indicative of malingering.

Price testified that he wanted to administer additional tests to Mays during the evaluation, but Mays refused to participate. Although Mays "reluctantly completed" the MoCA and RFIT, he refused to take other cognitive tests because "he did not see the point." Mays told Price that he could "see nothing good coming out of this evaluation" and he did "not want to dwell on the past." Eventually, Mays "politely said he was terminating the evaluation."

Price acknowledged that Mays has "cognitive impairment," but he did not diagnose Mays with dementia. He testified that he saw "no evidence of a decline" from 2009 to 2016. He also saw no evidence of impairment in Mays's "activities of daily living." And he further testified that Mays's mild level of cognitive impairment did not make him incompetent to be executed.

Price diagnosed Mays with the following mental disorders: (1) "Stimulant Use Disorder, Amphetamines, In Remission Secondary to Controlled Environment"; (2) "Paranoid Personality Disorder"; (3) "Substance-Induced Mild Neurocognitive Disorder, Secondary to Stimulant Use Disorder"; (4) "Major Depressive Disorder, Mild"; and (5) "Generalized Anxiety Disorder, Mild." However, Price testified that these disorders did not deprive Mays "of a rational understanding of the connection between his crime and his punishment." Price stated in his report that Mays "has a rational understanding that he is to be executed and that it is imminent even though he is holding on to the idea that a miracle might happened [sic] which would result in his release from prison." Price further opined that Mays "understands that he will be executed because he was convicted of capital murder even though he believes his conviction was totally unfair." Therefore, Price concluded that Mays "is competent for execution."

The final evaluation of Mays was conducted on April 27, 2017, by Woods, a neuropsychiatrist. Woods also reviewed Mays's records and interviewed him in person. Woods testified that he utilized the trial judge's checklist "to the degree that [he] could," but he noted that "anything that derives from that checklist may be problematic" because it had been peer-reviewed but not researched or validated.

In his report, Woods described Mays as "easily distractible despite attempts to focus." He noted that Mays "often had his left eye closed and would tilt his head in a quizzical look." Woods gave Mays a variety of screening tests which indicated that Mays had mixed

visuospatial skills, limited "constructional ability," significantly impaired executive functioning, and severely impaired abstraction ability. Mays also exhibited impaired memory. Mays was "generally cooperative," but he declined to answer many questions due to his "paranoid ideation," particularly questions "about his personal life and the instant offense." Woods further reported that Mays "had difficulty with test instructions" and expressed "repetition of theme" that was consistent with "perseveration."

Woods reported that Mays's thought processes were "connected, but delusional." His thought content was "paranoid, delusional, suspicious, [and] grandiose." He "denie[d] hallucinations on a consistent basis," but he described "a period of time . . . when he believed a small man sat on his shoulder, waving a knife at him." Mays believed that particular hallucination was caused by taking medication. Mays also complained of severe breathing problems due to "different air in the cells."

Mays told Woods that he was "developing a sustainable product to be used in the energy sector." Mays believed that he was "being conspired against" because "this device would hurt the oil industry tremendously." When Woods asked Mays "if he would trade the secrets of his device in return for his life," Mays replied that he would not do so. When Woods asked him "what the chances were of him being able to leave prison to complete and sell his sustainable device," he said, "50-50." Woods reported that Mays believes the State of Texas is "trying to kill him to prevent him from developing and selling his wind device and technology, which he believes is worth 'billions of dollars.'" When Woods asked Mays

how the State found out about his device, he said "they scanned his mail to his sister." Mays explained that he had unsuccessfully attempted to interest his sister in his business idea, but he hoped to enlist her when he was released. Woods reported that when Mays's delusions were questioned, "he would retreat by saying, 'I would rather not talk about that, Mr. Woods.'"

Woods reviewed the letters Mays wrote in prison, in which he expressed a delusional belief that he was being poisoned by the air, the ozone, and his food. Woods testified that Mays's letters also showed his "preoccupation and pervasiveness" in thinking about renewable energy and building an electric wind generator. Woods testified that Mays's delusion "is not the green energy [idea]," but instead is his belief that the State "is trying to kill him and keep him from marketing and developing [it]."

Woods concluded that Mays suffers from a Major Neurocognitive Disorder, which he testified is "dementia-form in nature." He testified that methamphetamine use typically does not cause "the types of ongoing cognitive impairments that [Mays] has." Woods also opined that Mays has "a psychotic disorder," but he was "on the fence about whether it's schizophrenia or not." Woods disagreed with Price's diagnosis of Paranoid Personality Disorder. Woods testified that Mays "falls much closer on the spectrum towards schizophrenia than he does on paranoid personality." Woods explained in his report that Mays "manifests symptoms that are consistent with the diagnostic criteria for schizophrenia; therefore, a diagnosis of schizophrenia must also be ruled out." However, he noted that there

was "no evidence of delirium," and there was a lack of evidence to indicate the "social deterioration [that] occurs in Schizophrenia[.]" Because Mays stopped using drugs decades ago, Woods opined that "drug induced psychosis has been effectively ruled out."

Woods did not believe that Mays was malingering. When asked if Mays had experienced a decline since Mayfield evaluated him in 2009, Woods responded: "He's gotten worse in terms of his delusions and his paranoia and psychosis. It's not clear that he's gotten worse in terms of his cognition."

Woods concluded that Mays is incompetent to be executed because "[h]e does not have a rational understanding of the connection between his crime and punishment." Woods testified that, although Mays has a factual understanding that the State is attempting to execute him, he does not have a rational understanding of the reason why he is to be executed. Instead, Mays's "overwhelming belief is that the Texas state government is trying to kill him to keep him from promoting this wind machine that he believes he has developed." Woods explained in his report that Mays has "awareness without insight," in that "[h]e is aware of a proceeding occurring," but "[h]is understanding of the basis for the motivation of the current proceeding is delusional[.]"

After the parties questioned Woods, the trial judge expressed that he had read the numerous letters that Mays wrote in prison and found only "eight that mention wind power." The trial judge added, "And in all of these, he's attempting to get a family member or friend to do it so they can save themselves money." The trial judge said that he did not see anything

in the letters that indicated "an obsession with the government being interested in [Mays's] wind farm ideas." The trial judge explained: "So I'm having a hard time connecting this, which is his everyday life for the last few years, with an obsession that the government is after him, because there's nothing in here that would indicate that." Woods responded: "Nobody in his family asked him why did he get these ideas. Nobody - - I mean, this did not come up until this particular situation came up." The trial judge continued:

> THE COURT: I would think if he was obsessed with it, he would have said something to somebody in some of these letters he was writing and say, the government is trying to kill me to get this wind farm information. I would think that would come from him, not from somebody's family member asking him. You know, they wouldn't know to ask a question like that.

> [WOODS]: But that is exactly what you see in paranoid persons and people that are paranoid. They don't provide that information. These conversations were enlightening, but they were basically pretty light. It wasn't until this legal issue came up that, in my opinion, this occurred.

> THE COURT: So it's your opinion, as you sit here today, that the gentleman sitting here, Mr. Mays, doesn't know why the State is trying to execute him?

> [WOODS]: No. It's my opinion his greatest belief is that the State is trying to execute him in order to keep this green [energy] thing and to keep him away. That's his greatest belief.

> * * *

> THE COURT: All right. Are you telling me that, as he sits here today, he doesn't have a rational understanding why the State is attempting to execute him for killing two people?

> [WOODS]: That's correct. I am saying that he knows that he's been convicted and he knows that ostensibly the reason is because of his conviction. But his real - - his real belief is what I've described.

**B. Other Evidence**

In addition to the testimony and reports of the appointed mental health experts, the parties presented additional evidence described below.

Mays's trial counsel, Bobby Mims, testified that he thought Mays was mentally ill during his trial. Prior to trial, the defense's mitigation specialist noticed in Mays's medical records that a jail physician had opined that Mays had organic brain injury. Mays refused to cooperate when Mims scheduled testing to investigate this possibility. Mims acknowledged that none of the defense trial experts said that competency might be an issue. He also acknowledged that Mays cooperated enough with the defense experts that they could proceed to trial.

Mims further testified about other instances in which Mays was uncooperative and paranoid before and during his trial. Despite the fact that Mims advised him not to talk about his case, Mays made incriminating statements to the press when he was moved from the hospital to the county jail. Mays also resisted releasing his medical records to trial counsel because "he felt like we were trying to get his Social Security." At one point during the trial, Mays wept and collapsed on the floor "like a rag," and Mims "couldn't get him up." Mays also had what Mims described as a disturbing "psychotic episode" in a holding cell when counsel discussed calling Mays's wife to testify. Mays stood up, and "his eyes went from being normal to little beady eyes, little pupils." Mays said, "Okay. I know what you guys are. I know this game." He went from being meek and courteous towards counsel to acting

"like somebody else." And he behaved in a similar way when he got into a confrontation with a deputy who transported him to and from the jail and the courtroom.

Mims testified that when he briefly spoke to Mays at the time of his writ hearing, Mays "seemed to be even more delusional" than he was at trial. Mays talked to Mims about ozone, bitcoins, and his belief that he was being poisoned in prison. Mays also wrote letters to Mims in 2017, which were admitted as exhibits in the competency hearing. Mims testified that Mays complained in these letters that prison guards were threatening him, and he offered to pay Mims ten thousand dollars to get him "out of Polunsky and back to work in Hopkins County." It appeared to Mims that Mays was "out of touch with reality" and "doesn't understand what [he is] facing" with regard to his pending execution.

Baldemar Quintanilla, an investigator from the District Attorney's Office, testified that he visited and photographed Mays's prison cell in 2015. The photographs were admitted as exhibits in the competency hearing. Quintanilla testified that Mays had a calendar in his cell on which he was counting the days until his scheduled execution. Mays also had a list of other death row inmates who had been executed or had received a stay of execution.

Nina Foster, a mental health manager at the Polunsky Unit, testified that her supervisor, Dr. Joseph Penn, referred Mays to her approximately two and a half weeks prior to the instant competency hearing. When asked if Mays had "been on anybody's radar" prior to that time, Foster replied: "No." Foster testified that, at the time she received the referral, Penn "was involved in a deposition" regarding Mays. Foster explained that Penn "[j]ust

wanted to make sure if [Mays] needed mental health treatment that he was receiving it."

Foster testified that she thereafter "did a mental health evaluation on [Mays]." Foster testified that she had good rapport with Mays, who appeared to be open and honest during the evaluation. Mays told Foster that he was "[h]aving some problems with depression." He said he had hallucinations in the past when he was "on drugs" in his twenties, "right before he went to the state hospital." With regard to whether Mays was presently experiencing hallucinations, Foster testified that Mays "briefly mentioned that he thought he had heard things, but he didn't want to talk about it." Foster added that Mays did not show signs of paranoia or psychotic symptoms.

Foster acknowledged that Mays mentioned "renewable energy sources" towards the end of their conversation. Mays asked, "Did I tell you about my idea?" Foster replied, "No. What do you mean?" Mays then responded that "he had an idea for renewable energy that could keep power for . . . 24 hours or so." Mays did not provide much detail on this topic. He did not say that anyone was trying to steal his idea. Foster did not think that Mays's comment was irrational, and it did not alarm her with regard to his mental health.

Following her evaluation of Mays, Foster "sent a referral to the psychiatrist to see him" about his reported depression. Foster testified that Mays thereafter had a teleconference session with a jail psychiatrist, and she believed that Mays "was started on medication" afterwards. Foster replied in the affirmative when she was asked if Mays was "on the mental health caseload now."

Dr. Joseph Penn, the director of mental health services and Foster's supervisor, gave a deposition on July 28, 2017, which was introduced into evidence at the competency hearing. Penn testified in the deposition about the psychiatric and mental health care services that are provided to death row inmates. He explained that every inmate is screened for mental health issues as part of the intake process when they enter prison. Inmates may also access mental health care by asking for it themselves or being referred by someone else. The correctional staff members are instructed to inform the mental health staff members if they notice bizarre behavior in inmates. An inmate "with any identified or diagnosable mental health disorder" can be placed on the mental health caseload. If an inmate is on the mental health caseload, the mental health staff checks on him weekly. Even if an inmate is not on the mental health caseload, he is seen by the mental health staff "every 90 days." In addition, members of the nursing staff make daily rounds to check on every death row inmate. If a death row inmate needs inpatient psychiatric treatment and his clinical needs cannot be met at the Polunsky Unit, he may be transferred to the Jester IV Unit. Penn acknowledged that "telepsychiatry," similar to video conferencing, is sometimes used to provide mental health care in prison. He opined that because Polunsky is a "high profile unit," the death row inmates are "probably getting more services and in a more timely manner" than other inmates.

Cathleen Cooper, a correctional officer, testified about her regular interactions with Mays on death row. Cooper described Mays as "very polite except when I've made him

angry."  For example, Mays told Cooper she was "hateful" when she denied his request for a "front handcuff pass."  Cooper acknowledged that she was included on a list Mays compiled which contained names of people he described as "hateful."

Cooper testified that she delivered encyclopedias to Mays's cell, and Mays liked to tell her "fun facts that he learned from the books that he's read."  However, Mays never mentioned to Cooper that he thought the air was bad or that he was being poisoned.  And he never said anything to her about a green energy invention or a State conspiracy against him.  Cooper acknowledged that Mays never did anything that would cause her to refer him to mental health services.  She further acknowledged that she never saw anything "out of the norm" regarding Mays.

In addition to the witness testimony and exhibits described above, other evidence admitted at the competency hearing included:  Mays's legal, medical, jail, prison, and educational records; transcripts of witness testimony from his trial and writ hearing; a summary of prison phone calls between him and his wife; police reports, interviews, and evidence pertaining to the instant offense; footage of his media interview following his arrest; letters that he wrote in prison; and grievances and sick call requests that he made in prison.

In the majority of his sick call requests, Mays complained about dental problems and requested a "front cuff pass" due to arm and shoulder pain.  He mentioned a few times in his prison grievances and sick call requests that he got sick from eating tainted food and had

breathing problems due to bad ventilation in his cell. He also complained in some of his sick call requests in 2014 that his "Teva" medication was causing him to hallucinate.

In the numerous letters that Mays wrote to friends and family members while he was in prison, he often mentioned tainted food making him feel sick and the ozone affecting his breathing. He also consistently talked about his ideas for a "renewable energy design" while trying to convince them it would be good for the environment and enable them to save or earn money. However, Mays did not say in the letters that the State was trying to execute him because of his renewable energy design.

## IV. THE TRIAL JUDGE'S FINDINGS AND CONCLUSIONS REGARDING COMPETENCY TO BE EXECUTED

### A. The Trial Judge's Order

The trial judge signed an "Order on TCCP Article 46.05 Hearing," which contained his findings and conclusions regarding Mays's competency to be executed. The trial judge determined that Mays had failed to prove by a preponderance of the evidence that he is incompetent to be executed. In making this determination, the trial judge "considered all of the sworn testimony of witnesses, exhibits, depositions, expert reports, briefs from both parties, and oral arguments of counsel." With regard to the credibility of the witnesses, the trial judge "considered their observed attitudes, their interest in the outcome, their relationships with the parties, if any, and the probability or improbability of their testimony."

The trial judge stated that he "read and considered over 130 pages of writings by [Mays] while on death row," most of which were letters "to his mother and other family

members and friends." The trial judge explained: "Nowhere in the correspondence did I see any sign of [Mays's] obsession with wind energy that Dr. Woods and Dr. Agharkar referred to." He added: "The few times this subject was ever mentioned was as a suggestion for ways to save on household electric bills."

The trial judge pointed out that Mays wrote a letter to his wife in which he "describe[d] the crime scene and provide[d] specific details of officers' actions." The trial judge also noted that Mays wrote a letter to his sister one month prior to his original March 2015 execution date in which he discussed "the cost of necessary materials needed to build 'the wood box,' and gave information on where to obtain the supplies." In that same letter, Mays informed his sister of "burial plots" that had been purchased for the Mays family in "Dunbar cemetary."

The trial judge expressed concern about the "objectivity" of expert witness Woods because "[Woods] was observed passing written notes to counsel for the Defendant during her examination of Dr. Randall Price." The trial judge explained: "It appeared to the Court that Dr. Woods had become an advocate by such action rather than fulfilling his charge by the Court to provide the Court the benefit of an objective assessment."

The trial judge noted that expert witness Price "was the only expert who included the guidelines specified by the Court in the Order of Appointment." The trial judge also found that when Mays was examined by Price, Mays "did not even mention his so-called 'obsession' over his clean energy design, much less indicate [that] it was the reason he was

to be executed."

The trial judge pointed out that Mays did not "mention anything about green energy theories, poison in food, or air pollution" to correctional officer Cooper in the sixteen months in which Cooper had "significant contact" with him on death row. Cooper "never observed any conduct necessitating referral to a mental health professional." Cooper testified that Mays read numerous books and periodicals in prison. Based on Cooper's testimony and Mays's written correspondence, the trial judge found that Mays gained knowledge about "tree farms, tax advantages, low-interest loans for wind-generated electricity, and various medications" from his "prolific reading and research" on these subjects.

The trial judge further found that "[s]ince Mr. Mays has been sitting on death row, he has not been diagnosed, treated, or received prescribed medications for any mental illness or obsession that has any bearing on this inquiry." The trial judge also observed during the competency hearing that Mays and his counsel "had a steady stream of written notes passed between them," and Mays "appeared to be fully participating in the hearing as much as he physically could."

The trial judge ultimately concluded that Mays: (1) is competent to be executed pursuant to Article 46.05 and the guidelines set forth in *Panetti*[22] and *Battaglia*;[23] (2) has a rational understanding that he is to be executed and that his execution is imminent; (3) has

---

[22] *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842 (2007).

[23] *See Battaglia v. State*, 537 S.W.3d 57 (Tex. Crim. App. 2017), *cert. denied*, 138 S. Ct. 943 (2018).

a rational understanding of the reason for which he will be executed; and, (4) has "some form of mental illness" which "does not deprive him of the rational understanding of the connection between his crime and the punishment received."

## B. The Standard of Review

Under Article 46.05(k), Mays has the burden to establish by a preponderance of the evidence that he is incompetent to be executed.[24] Preponderance of the evidence is defined as "the greater weight of credible evidence that would create a reasonable belief in the truth of the claim."[25]

In *Battaglia*, we recognized that "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it."[26] We held:

> [A] prisoner is competent to be executed under Article 46.05 if he knows he is to be executed by the State, he knows the reason he is to be executed, he knows that the execution is imminent, and, despite any delusional beliefs or other mental illness he may have, and despite the fact that he may deny having committed the capital offense, he comprehends that there is a "causal link" between his capital offense and his imminent execution, beyond merely identifying the State's articulated rationale for the execution.[27]

The trial judge determined that Mays failed to meet his burden to establish by a preponderance of the evidence that he is incompetent to be executed. Citing Article 46.05,

---

[24] *Id.* at 90; *see also* Art. 46.05(k).

[25] *Id.* (citing *Druery v. State*, 412 S.W.3d 523, 540 (Tex. Crim. App. 2013)).

[26] *Id.* at 81 (citing *Panetti*, 127 S. Ct. at 2862).

[27] *Id.*

*Panetti*, and *Battaglia*, the trial judge concluded that Mays knows he is going to be executed and his execution is imminent, and he has a rational understanding of the reason he is going to be executed. The trial judge further concluded that Mays (despite having "some form of mental illness") understands there is a connection between his crime and his imminent execution. Our task is to determine whether the trial judge abused his discretion in the way he applied Article 46.05 to the facts presented in this case.[28]

When reviewing a trial judge's determination of execution competency, we apply a "highly deferential" standard of review.[29] We will reverse the trial judge's determination only if it is outside the zone of reasonable disagreement.[30] We will sustain the trial judge's ruling if it is supported by the record and is correct on any theory of the law applicable to the case.[31]

## C. Analysis of the Trial Judge's Competency Determination

The experts agreed that Mays understands he is to be executed and his execution is imminent. However, they disagreed about whether Mays has a rational understanding of the reason he is to be executed. Two of the experts, Agharkar and Woods, concluded that Mays is incompetent to be executed because he does not have a rational understanding of the

---

[28] *See id.* at 89.

[29] *Id.* at 90 (citations omitted).

[30] *Green v. State*, 374 S.W.3d 434, 441 (Tex. Crim. App. 2012) (citations omitted).

[31] *Id.* at 441–42 (citations omitted).

reason he is to be executed. Price, however, arrived at the opposite conclusion. The trial judge agreed with Price.

Mays argues on appeal that the trial judge abused his discretion by crediting the opinion of Price over Agharkar and Woods. He complains that the trial judge ignored Agharkar's opinion in making the competency determination. However, the trial judge expressly stated in his order that he considered all of the witness testimony and expert reports. A trial judge is generally within his authority to accept the evidence that he believes is most credible and convincing and reject that which he finds not credible.[32]

All three experts reviewed Mays's records and conducted face-to-face interviews with him. Agharkar met with Mays twice, while Price and Woods met with Mays only once because at some point Mays refused to participate. Agharkar, who is a medical doctor, acknowledged that "[m]edical doctors are not trained to give psychological tests." Therefore, Agharkar only "conducted screenings," and he admitted that he "would never diagnose someone based on [his] screenings." Price and Woods, on the other hand, conducted more comprehensive testing than Agharkar did.

The trial judge noted concerns about Woods's "objectivity" because he observed Woods passing notes to Mays's counsel during the competency hearing. The trial judge had the discretion to assess the credibility of the witnesses, and he explained that he did so based upon a variety of factors, including "their observed attitudes, their interest in the outcome,

---

[32] *Battaglia*, 537 S.W.3d at 91.

their relationship with the parties, if any, and the probability or improbability of their testimony."

Mays attacks Price's credibility because Price's partner in his psychology practice, Dr. Timothy Proctor, had been on the State's list of potential witnesses at Mays's 2008 capital murder trial. Mays contends that "[t]his fact alone should have caused the court to discount Dr. Price's objectivity in this matter." Price acknowledged at the hearing that he became aware of this fact at some point, but he denied discussing Mays's case with Proctor. And it appears from Defense Exhibit 48, an excerpt from the transcript of Mays's punishment trial, that the State did not actually call Proctor to testify. In this excerpt, the trial prosecutor stated that Proctor was one of "a number of experts that [he was] going to call in possible rebuttal" if the defense called a mental health expert to testify. The trial prosecutor then explained that he "declined to call any experts in rebuttal on that [issue]." Under these circumstances, we fail to see how Price was laboring under a *per se* conflict of interest. Accordingly, it was within the trial judge's discretion to find Price's opinion credible and persuasive.

Mays also asserts that Price "lacked the requisite clinical experience to conduct the assessment" in this case. The evidence shows otherwise. Price testified that he had prior experience in "competency-for-execution evaluations" at the request of both the State and the defense. He estimated that "at least 80 percent" of his work involved evaluating inmates in correctional facilities. Mays additionally complains that Price failed to build rapport and made a hasty conclusion about his competence without conducting a follow-up interview.

But the record establishes that all of the experts had some difficulty establishing rapport with Mays, not just Price. Both Agharkar and Woods acknowledged that Mays avoided answering some of their questions. In addition, Mays accused Agharkar of trying to "put words into his mouth" and "psych him out."

Mays further argues that Price made errors when calculating his score on the MoCA test. Price reported that Mays scored 26 points out of 30, which placed him in the "mild cognitive impairment range but only one point short of the normal range." Mays contends that Price's calculation errors artificially inflated his score. Price admitted at the competency hearing that he had made calculation errors when scoring the MoCA test. However, it appears from his testimony that it would have only made a one or two point difference in Mays's score. Price testified that MoCA scores ranging "[f]rom 18 to 26" indicate "mild cognitive impairment." If that is the case, then Mays would still fall within the "mild cognitive impairment" range even if his score was one or two points lower.

Mays also takes issue with the trial judge's finding that Price "was the only expert who included the guidelines specified by the Court in the Order of Appointment." Although Agharkar and Woods testified that they used the guidelines and checklist to some extent, they expressed criticism of these items. Price, on the other hand, believed that it was the "best practice" to use checklists in evaluations. Although Mays acknowledges in his brief that the guidelines and checklist were provided to the experts "at the suggestion of Mays's counsel," he now argues that they "are ultimately ancillary to the trial court's referral questions"

because they pre-date *Panetti*. Price, however, utilized his own checklist in addition to the one provided by the trial judge. And Price testified that his own checklist was developed in accordance with *Panetti* and Article 46.05.

Further, Mays attacks the trial judge's finding that, "[s]ince Mr. Mays has been sitting on death row, he has not been diagnosed, treated, or received prescribed medications for any mental illness or obsession." That is how Mays quotes the trial judge's finding in his opening brief, but that is not what the trial judge's finding actually says. The trial judge actually found that, since he has been on death row, Mays has not been diagnosed, treated, etc., for any mental illness or obsession "that has any bearing on this inquiry." In light of this qualification, this finding is better understood as a statement that, whatever mental impairments Mays suffers from, they have not rendered him incapable of understanding (1) that he is to be executed and (2) the reason he is to be executed. This finding is supported by the record because it was Dr. Price's stated opinion, as reflected both in his written report and in his testimony. And, as we have already discussed, the trial judge was generally at liberty to credit Price's opinion over the other experts' opinions.

But let us assume *arguendo* that what the trial judge really meant was that, while on death row, Mays was never diagnosed, treated, or medicated for any mental illness or obsession at all. Mays argues that such a finding would be incorrect because all three experts agreed that Mays has a mental illness (although they disagreed about the precise diagnosis).

It is true that Agharkar, Price, and Woods all found Mays to have some form of mental

illness when they examined him in 2016 and 2017, prior to the competency hearing. And Mays's records indicate that he was taking prescribed anti-depressant and anti-psychotic medications when he was in Smith County Jail prior to his 2008 trial. However, Foster testified that Mays had not been on the death row "mental health caseload" until 2017. Foster acknowledged that, prior to 2017, Mays had not "been on anybody's radar" regarding potential mental health problems on death row. Thus, it appears from the record that Mays was not being regularly medicated for a diagnosed mental illness while incarcerated on death row between 2008 and 2017.

Mays argues that he was not being treated for mental illness because of the "poor mental health treatment" provided to death row inmates. For example, he points out that no one followed up on a 2014 prison "correctional managed care" report that stated: "Offender kept talking about gases in the air. Please schedule to be evaluated by mental health." Foster and Penn, however, both testified that death row inmates who are not on the mental health caseload are still seen by the mental health staff every 90 days. They also testified that nurses with mental health training make daily rounds to check on death row inmates. Penn testified that the "custody staff" are trained to alert the mental health staff when they notice bizarre inmate behavior. Correctional officer Cooper, who had regular contact with Mays in the sixteen months prior to the competency hearing, testified that she never observed Mays do anything "out of the norm" that would cause her to refer him to mental health services. And when Foster evaluated Mays a few weeks prior to the competency hearing, Mays said he had

been experiencing depression but showed no signs of paranoia or psychotic symptoms.

Mays next complains about the trial judge's finding that Mays did not mention to Price "his so-called 'obsession' over his clean energy design, much less indicate [that] it was the reason he was to be executed." Mays argues that he did "bring up his plans for renewable wind energy" with Price, but Price failed to "dig into [his] delusional thought processes," and instead changed the subject.

Price acknowledged that Mays talked to him about the topic of "the environment and energy alternatives" during their evaluation. Mays told Price that he studied the topic because he was interested in it, and he corresponded with friends and family about it because "he wanted to help people . . . build things that were environmentally friendly[.]" Price thought Mays sounded rational when discussing the topic. In his letters to friends and family members, Mays consistently mentioned his idea for a "renewable energy design" while trying to convince them it would be good for the environment and would enable them to save or earn money. But Mays did not state in these letters or during his evaluation with Price that the State was going to execute him because of his renewable energy design. Nor did he mention anything in this regard to Cooper, the correctional officer who had regular contact with him in prison for sixteen months prior to the instant competency hearing. Although Mays liked to tell Cooper "fun facts that he learned from the books that he's read," he never told her anything about bad air, poisoned food, his green energy invention, or a State conspiracy against him.

Furthermore, Price's interview with Mays did not simply fail to uncover a delusional understanding on Mays's part of the reason for his execution; it actually produced some affirmative evidence that Mays had an accurate and rational understanding of the reason for his execution. Mays told Price that he understood he was on death row because he had been convicted of capital murder for killing a police officer. While Mays also told Price that he believed the conviction was unjust, Price testified that it is very common for inmates to deny that they were at fault in committing an offense. And even Woods acknowledged that whether a person believes they were justly convicted is "not really an issue for you when it comes to competency." Price also clarified that it is common, and certainly not irrational, for an inmate to hold the belief that, against all odds, his conviction might one day be overturned.

Mays also spoke of the capital murder in terms of "they say" ("they say I murdered two police officers"), which might suggest that he was simply reciting or parroting back the State's proffered reason for seeking his execution.[33] But Price explained that this phrasing was consistent with Mays's general pattern of not wanting to "give a statement of guilt"—again, "not an uncommon thing" for an inmate in Mays's position. Price further noted that Mays generally avoided discussing the facts of the underlying offense on the advice of his attorneys. Phrasing the capital-murder offense in terms of "they say" could also be construed as an attempt to comply with this advice. It need not necessarily indicate a

---

[33] *See Battaglia*, 537 S.W.3d at 65 (discussing *Panetti*, 551 U.S. at 959).

delusion, and Price certainly did not take it as such. We cannot say that the trial judge abused his discretion in crediting Price's opinions in these regards.

Finally, Mays argues that *Battaglia* is distinguishable from his case because it "hinges" on the fact that Battaglia was malingering. He argues that if this case is affirmed, then the standard articulated in *Battaglia* means that "trial courts are free to decide that an offender's delusions are largely irrelevant so long as there is evidence that he knows the State plans to execute him and there is evidence that he can read and write at a sixth-grade level."

The State responds that, when comparing *Battaglia* to the instant case, "[t]he similarities are far more compelling than their differences." We note that there was conflicting evidence regarding competence to be executed in both cases. Further, both Battaglia and Mays expressed conspiracy-based delusions, lacked a record of mental health referrals while on death row, and appeared to function adequately without anti-psychotic medications in prison. Although the absence of malingering is a factor we may consider in this case, it is not necessarily dispositive of the issue at hand.

The standard articulated in *Battaglia* takes an inmate's delusions and mental state into account. But even if an inmate has delusions, he may still be executed if he can rationally understand the reason for his execution. Delusions "come in many shapes and sizes, and not all will interfere with the understanding that the Eighth Amendment requires."[34] The critical question is whether a prisoner's mental state or concept of reality is so impaired that he

---

[34] *Madison v. Alabama*, 139 S. Ct. 718, 729 (2019) (citing *Panetti*, 551 U.S. at 962).

cannot grasp the execution's "meaning and purpose" or the "link between [his] crime and punishment."[35] As shown in his letters, Mays told his friends and family members about his renewable energy design over the years. He also expressed his interest in the topic of renewable energy to Price and Foster. But there is no evidence that he told anyone besides Agharkar and Woods that he believed that the State planned to execute him in order to stifle his renewable energy invention. As Woods testified, the relevant delusion "is not the green energy [idea]," but instead is Mays's belief that the State "is trying to kill him and keep him from marketing and developing [it]." And Woods acknowledged at the competency hearing that Mays did not articulate that particular belief to anyone "until this legal issue came up."

## V. CONCLUSION

The record supports the trial judge's determination that Mays is competent to be executed. Mays knows he is to be executed by the State, he knows he was convicted and sentenced for killing a police officer, and he knows his execution is imminent. The experts gave conflicting opinions on whether Mays has a rational understanding of the reason he is to be executed. It was within the trial judge's discretion to evaluate the weight and credibility of the conflicting evidence. There is evidence in the record supporting the conclusion that Mays comprehends that there is a "causal link" between the capital offense and his imminent execution beyond merely identifying the State's articulated rationale for the execution.

---

[35] *Id.* at 723 (citing *Panetti*, 551 U.S. at 958, 960).

Therefore, the trial judge's decision that Mays failed to establish by a preponderance of the evidence that he is incompetent to be executed is within the zone of reasonable disagreement and not an abuse of the trial judge's discretion. We affirm the trial judge's decision finding Mays competent to be executed and lift the stay of execution.

DELIVERED: June 5, 2019
DO NOT PUBLISH